NEWARK INSURANCE COMPANY, Plaintiff-in-Error, v. MRS. MURIEL M. SEYFERT, Executrix and Widow of Dr. Carl Seyfert, Deceased, Defendant-in-Error. —392 S.W.(2d) 336.

Middle Section.  July 31, 1964.

Certiorari Denied by Supreme Court March 4, 1965.

Cornelius & Collins, Nashville, for plaintiff in error.

Goodpasture, Carpenter, Woods & Courtney, Nashville, for defendant in error.

HUMPHREYS, J. Mrs. Muriel M. Seyfert as widow and executrix of her husband, Dr. Carl Seyfert, deceased, recovered a judgment against Newark Insurance Company, and Newark has appealed in error.

By her declaration plaintiff alleged Dr. Seyfert had been employed by Vanderbilt University as a professor of

astronomy and to run, manage and maintain the Arthur J. Dyer Observatory, its equipment and properties operated by and under the auspices and as a part of Vanderbilt University in connection with its research and educational activities. That defendant, on April 11, 1960, issued a policy insuring for $50,000.00, the officers, faculty, staff and employees of Vanderbilt University accidentally killed while driving a passenger automobile on the business of the university. That Dr. Seyfert while in the course and scope of his employment, driving his automobile for the purpose of obtaining items of equipment belonging and to be used at the Arthur J. Dyer Observatory, was involved in a fatal automobile collision, and so plaintiff was entitled to recover $50,000.00 and interest.

Special pleas were filed which raised three principle issues as follow:

1. Whether Dr. Seyfert at the time of his death was engaged in travel within the meaning of the group travel accident insurance policy issued to Vanderbilt University.

2. Whether Dr. Seyfert at the time of his death was on the business of Vanderbilt University.

3. Whether Dr. Seyfert's death was the result of a hazard to which he was exposed in the course of his employment within the meaning of the policy.

The case was first tried in the Third Circuit Court of Davidson County before Honorable Henry F. Todd and a jury, where there was judgment for plaintiff for $56,500.00. On motion for a new trial and peremptory instructions, a new trial was granted on the insufficiency of the evidence to satisfy the trial judge, but peremptory instructions were denied. Exception was noted and a way-

side bill of exceptions filed. The case was later tried in the Fifth Circuit Court of Davidson County before Honorable Sam L. Felts, Jr., and resulted in a verdict and judgment in favor of plaintiff in the principal sum of the policy, and interest amounting to $58,640.00. Newark has appealed and we now have the case on assignments of error on both trials.

There is one assignment on the wayside bill of exceptions: That the lower court erred in declining to grant defendant's motion for peremptory instructions made at the conclusion of all the proof. It is said this was error because: (1) There was no evidence upon which a verdict against defendant could be based. (2) The uncontradicted proof showed deceased, Dr. Seyfert, was not engaged in travel within the meaning of the group travel policy. (3) There was no competent evidence that Dr. Seyfert was on the business of Vanderbilt University at the time of his death. (4) There was no competent evidence that Dr. Seyfert's death was the result of a hazard to which he was exposed in the course of his employment.

In considering this assignment for peremptory instructions we must, of course, consider all of the evidence, taking the plaintiff's evidence as true, discarding all countervailing evidence. And, taking the strongest legitimate view of the plaintiff's evidence, draw all reasonable inferences therefrom in her favor, and deny the motion if there is any material, determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence. Smith v. Sloan, 189 Tenn. 368, 225 S.W. (2d) 539, 227 S.W.(2d) 2; Lackey v. Metropolitan Life Insurance Co., 30 Tenn.App. 390, 206 S.W.(2d) 806.

The proof is that Dr. Carl Seyfert came to Vanderbilt in 1946, when its observatory was located on Vanderbilt

Campus. Subsequently the Dyer Observatory was built in the southern part of Davidson County, approximately nine miles from the campus, on a hill of about 1,000 to 1,100 feet in elevation. Under his contract of employment with Vanderbilt, Dr. Seyfert served as professor of astronomy in the Physics Department and also as custodian of the Observatory, responsible for it and the physical equipment in it. As custodian of the Observatory and its equipment, he was required by the University to live in a dwelling house erected on the observatory grounds. His custodial duties and research and scholarly activities were year-round in requirement and character and were not halted by vacations or holidays.

Dr. Seyfert went to and from the Observatory and the Nashville campus in his automobile. His classes were arranged to commence not before eleven o'clock in the morning so he could sleep after his astronomical observations at night.

On the night of Dr. Seyfert's death, a Dr. Tifts, a visiting professor of astronomy, and a new faculty member, was to arrive at the Nashville Airport, and preparations had been made at living quarters within the Observatory for Dr. Tifts to spend the night.

On the same night, Mr. Jack DeWitt, President of WSM, an electronics expert, who was also a member of the faculty at Vanderbilt University as a research associate in the Physics Department in astronomy, and who worked closely with Dr. Seyfert on projects at the Arthur J. Dyer Observatory was in possession of a plate holder, a device used on the telescope at the Observatory, and a knife edge, belonging to the Observatory. Mr. DeWitt had these items for use in certain tests in connection with work he was doing in his capacity as faculty member

and research associate on the Vanderbilt faculty. Mr. DeWitt's home is located on Hood's Hill Road near the intersection of Woodmont Boulevard and Hillsboro Road, in Nashville.

On the night he was killed, Dr. Seyfert called Mr. DeWitt on the telephone and told him he needed the plate holder for use at the Observatory and would be by to get it. Mr. DeWitt offered to return the equipment himself, but Dr. Seyfert declined this. As communicated to Mrs. Seyfert and Mr. DeWitt in conversations with each, Dr. Seyfert left the Observatory for three purposes. (1) To substitute for radio announcer Boyce Hawkins at WSM T.V. Station for the 10:10 weather broadcast; (2) to go to the home of Mr. DeWitt and pick up the Vanderbilt equipment there; and, (3) to pick up Dr. Tifts at the airport and take him to the observatory.

Following the broadcast, Dr. Seyfert was killed in an automobile collision at the place where Stokes Lane dead ends into Hillsboro Road. A map of the City of Nashville filed by plaintiffs indicates that a direct route from the WSM station to Mr. DeWitt's house would be to go west on Woodmont Blvd, to the intersection of Woodmont and Hillsboro Road, and then across Hillsboro Road to DeWitt's home on Hood's Hill Road near the intersection. However, Woodmont was blocked for traffic that evening, with "horses" across the entrances, so a next direct route would be by way of Stokes Lane, the first road north of Woodmont, and then to Hillsboro Road. The map indicates the place where Seyfert was killed was not on a route to his home from WSM. It is also undisputed the front-end of Dr. Seyfert's car collided with the right side of a northbound automobile at the point where Stokes Lane dead ends into Hillsboro

on the east. The reasonable inference from this is that Dr. Seyfert had proceeded west on Stokes Lane to the point of collision.

From the map and these facts a reasonable inference is that Dr. Seyfert was on his way from WSM TV station to Mr. DeWitts' house to obtain the Observatory equipment, when he was killed.

The policy of insurance, exhibited to the declaration insured against these hazards:

"5. Description of Hazards

The hazards against which the insurance is granted are:

1. Common Carrier (Land, Sea, Air)—Business only

2. Supplementary Private Automobile—Business only."

A rider attached to the policy was entitled "GROUP TRAVEL ACCIDENT" and "SUPPLEMENTARY PRIVATE AUTOMOBILE RIDER BUSINESS ONLY" and provided:

"The hazards against which insurance is granted under the policy to which this rider is attached are all those to which the Insured Employee, in the course of his employment, may be exposed,

'While driving or riding in a private passenger automobile of the exclusively pleasure car type, excluding any such automobile being used as a taxicab, bus or other public conveyance.' "

Defendant's proof did not contradict plaintiff's, but was directed to sustaining its pleas. It consisted of testi-

mony of Gerald Henderson, business manager of Vanderbilt University, that he negotiated with Charles Geny, an insurance agent, for a group travel insurance policy for the University. Henderson advised Geny he wanted a policy that would cover employees and faculty members who travelled away from Nashville in line of duty, and gave Geny information about the number of University personnel who did this kind of travel. Geny furnished this information to Stanley Gunnels, an employee in the underwriting department in defendant's Nashville office, who incorporated it into a preliminary proposal. This preliminary proposal, defendant's exhibit 2, was sent to defendant's New York office where Richard J. Burns worked up a premium rate of approximately $1,500.00.

The preliminary proposal as first made up made no reference to use of private automobiles. Sometime after the preliminary proposal had been sent to New York, Henderson proposed to Geny that the coverage be broadened, and it was, to include not only "student faculty," but "officers, faculty, staff and employees", and to include "supplemental automobile coverage". This information was transmitted by Geny to Gunnels to Burns who increased the rate on account of the additional coverage from $1,500.00 to $1,694.96. With respect to this, witness Geny testified, that after a discussion with Henderson, "I reported to Mr. Gunnels that the amount of travel would be approximately ten per cent by automobile".

In the course of Mr. Henderson's cross-examination, plaintiff put the following letter in evidence, written and mailed with Henderson's approval.

"The statement of fringe benefits provided by Vanderbilt University as mailed to you shortly after April 12,

1960, contains statements with respect to coverage and limitations which, apparently, did not strictly accord with the obligations of the insurance company as disclosed by the definitive policy which was received after this statement was mailed by the University to its officers, faculty, staff and employees. The original policy issued by Newark Insurance Company, dated April 11th, 1960, and effective from and after April 12, 1960, with various riders attached thereto, is on file in the office of Gerald Henderson, Business Manager, and is available for examination and inspection by all persons covered thereby, for a more detailed statement of the coverage and benefits.

'However, your attention is called specifically to the fact that the policy, when received, and is now in effect, defines the hazards against which insurance is granted under the policy and the riders as 'Those to which the insured employee in the course of its employment may be exposed' while driving or riding in a private passenger automobile of the exclusively pleasure car type, excluding automobiles used as taxi-cabs, bus or other public conveyances, and there is no provision in the policy restricting coverage to travel from destination in excess of twenty-five miles from the City Limits of Nashville, nor is there any specific provision in the policy restricting coverage to travel for which the expenses are paid by the University. The policy affords coverage while traveling in public carriers, including aircraft, under the conditions stated in the policy. If you have any questions concerning coverage and conditions of liability, inquiries should be addressed to this office and a photostatic copy of the original policy and

rider may be seen at this office during reasonable business hours.

> Yours very truly,
>
> Vanderbilt University
> by Meredith Trotter''

Additionally, it was shown the insurance policy, which was issued April 11, 1960, which admittedly contains no definition or restriction of travel except on business in course of employment, was lodged in Henderson's office and remained there throughout the term of the policy, and had been twice renewed, after this suit, with no changes in the coverage afforded.

It is also important to state the record contains no affirmative evidence the prior understanding was to apply to the supplemental automobile rider. This only appears by inference. On this Geny testified ''Q. And with regard to this, what, if anything, did you report to Mr. Gunnels? A. I reported to Mr. Gunnels that the amount of travel would be approximately ten per cent by automobile.''

Gunnels, who sent the information to the New York Office, testified:

''Q. I will ask you if you can identify this instrument that has been filed here as Defendant's Exhibit No. 2?

A. Yes, sir.

Q. Do you recognize the handwriting used to complete that form?

A. Yes, sir, I do.

Q. Whose handwriting is that?

A. My handwriting.

Q. Where did you get the information that appears there in your handwriting?

A. Charles W. Geny.

Q. And where was Mr. Geny when he gave it to you?

A. At my desk in the office.

Q. What did you do with that information and that form?

A. I relayed the information to the New York office.

Q. Did you—

THE COURT: Wait, let's get the witness to answer your question. What did you do with the form?

Q. What did you do with that form after it was completed?

A. You are speaking of this form?

Q. Yes.

A. It was sent to our New York office.

Q. Now, have you had possession of that form since you sent it to the New York Office until today?

A. No sir.

Q. I believe on yesterday you telephoned Mr. Burns of the New York office and Mr. Burns brought that form down here?

A. That is correct.

Q. But you do recognize that as your handwriting?

A. Yes, I do.

Q. And the information Willie Geny gave to you?

A. Yes sir.

Q. Now, were there any additions to the information that Mr. Geny gave to you in that preliminary proposal?

A. You mean at a later date?

Q. Yes.

A. Yes.

Q. Before the issuance of the policy?

A. Yes sir.

Q. And what were the changes, if you recall?

A. To add supplemental private passenger automobile coverage.

Q. Any other changes?

A. Yes sir, there was a change in the name of the insured as to the people who were covered.

Q. What does that preliminary proposal show as to the personnel who would be covered?

A. The Student Faculty.

Q. Was that wording expanded to include the people who are named in the policy?

A. Yes.

Q. Officers, staff members, faculty and employees of Vanderbilt University?

A. To the best of my memory, that is correct.

Q. What was the purpose in sending this information into the New York office?

A. For the rating of the policy.

Q. Did you later receive word from the New York office about what the premium would be?

A. Yes sir, I did.

Q. And what person in the New York office were you dealing with on this matter?

A. Mr. Richard J. Burns.

Q. That is the gentleman who brought this form down here.

A. Yes sir.

MR. CORNELIUS: That's all.

MR. COURTNEY: No questions."

Bill of Exceptions, pp. 255-257

■ In the light of this proof, and other proof we shall mention, was the trial judge in error in declining to direct a verdict on the ground the contract of insurance was susceptible of but one interpretation, that being that it insured only against travel away from Nashville to some distant point? After the fullest consideration of this question, we are satisfied he was not.

In view of the rule that we must consider the evidence favorable to the party moved against, and against the movant, this contention must be overruled.

Considering the language in which the contract of insurance was finally written, and in which it has remained for several years; and considering that the preliminary proposal, which was the only written instrument introduced in the proof as passing from the Nashville Office to the underwriting office in New York, contains no ex-

press provision with respect to the meaning of travel, but only such inferences as may be drawn from the provisions therein relating to the estimated number of employees and trips, and average duration of trips, all of which must be considered in the light of the fact this information was placed in the preliminary proposal at a time when the only travel contemplated was by common carrier, and since there is no affirmative direct proof the limitation of travel that might be drawn from these inferences was to apply to the automobile coverage; and the further fact that the only information submitted to New York on the supplemental automobile coverage was that travel by automobile would be approximately ten per cent, which was not further defined; and in view of the further fact the negotiation between Vanderbilt and defendant extended over a period of months, the preliminary proposal for insurance being dated September 24, 1959, and the insurance policy issued April 11, 1960, we think it was for the jury to say just exactly what the company meant by the contract of insurance it issued.

The policy rider on which the suit is predicated actually uses the word "travel" in only one place, and it is not so used there as to describe the hazards insured against, but is used simply to describe generally the nature of the rider. It appears at the upper righthand of the rider, not in the insuring provision, in the term, "Group, Travel Accident". The rider is in this form.

"GROUP TRAVEL ACCIDENT

SUPPLEMENTARY PRIVATE
AUTOMOBILE RIDER
BUSINESS ONLY

This rider is attached to and hereby made a part of the policy designated below and is effective as of the date

indicated, at 12:01 A.M., standard time at the employer's address as stated in the policy.

| Policy Number | Name of Company | Rider (Month, Day, Yr.) |
|---|---|---|
| MXT 20 01 22 | Newark Insurance Company | Effective Date—4/11/60 |

Employer

Vanderbilt University

The hazards against which insurance is granted under the policy to which this rider is attached are all those to which the Insured Employee, in the course of his employment, may be exposed,

While driving or riding in a private passenger automobile of the exclusively pleasure car type, excluding any such automobile being used as a taxicab, bus or other public conveyance.

This rider is subject to all the provisions, exception, limitations and reductions of such policy which are not inconsistent herewith and shall not bind the Company unless countersigned by a duly authorized representative of the Company.

Countersigned by: McKEE, OLIVER & GENY

s/ Chas. W. Geny                                    s/ C. SMITH,
--------------------------------------------                    President.
Licensed Resident Agent

CR65785        2500-8-56''

Tr. p. 13.

Assuming for the present the evidence of preliminary negotiations does not violate the parole evidence rule (an assumption forced since plaintiff did not take a wayside bill of exceptions and appeal from the admission of

this evidence over objection) there is such evident disagreement between Henderson and Geny's understanding of the word "travel" and the insuring clause of the contract, that it would have been error to instruct the jury the contract meant only travel away from Nashville to some distant point. After all Henderson's and Geny's understanding is only important if the company understood the same thing—and that understanding must be shown to relate to automobile coverage and the information received by the company on automobile coverage must, for a verdict to be directed, mean only one thing and that meaning has to be determined on the basis not only of what Geny and Henderson thought but what the company meant by its policy.

In other words, it was for the jury to say whether the company intended to insure to the extent provided on the face of its contract since it issued the policy, not Geny and Gunnels. As issued by the company and as accepted by Vanderbilt, (witness Henderson participating in this acceptance to the extent of approving a letter declaring travel had no limited interpretation under the policy as issued), the contract of insurance could support plaintiff's suit. In our opinion the trial judge simply could not have said in view of this that the policy was issued with the single intent of insuring trips for a distance from Nashville.

Necessarily, in reaching this conclusion we have considered defendant's argument that travel at a distance is one of the acceptable meanings of the word "travel". However, in our view of the case this is not so determinative of the intent of the contract as to sustain the motion for peremptory instructions. The word "travel" is not used in the insuring clause sued on, and is so used

in the automobile supplemental rider as to leave it uncertain whether it was intended to have any limiting effect on the insurance clause at all. We repeat the question is not exclusively what did Henderson order from Geny but must be, as well, what did the company understand as shown by the proof of the ordering and the contract. Defendant makes an excellent and persuasive argument on this point, but we do not think it is entitled to prevail.

■ The evidence offered by defendant on the other two issues, (1) whether Dr. Seyfert was on Vanderbilt's business as required by the policy and (2) whether his death was the result of a hazard to which he was exposed in the course of his employment within the meaning of the policy is to this effect.

Dr. Seyfert at the time of his death was employed by WSM as a weather forecaster and had just completed a 10:10 P.M. weather forecast a short time before. He was driving his personal automobile at the time of the fatal accident. There is no proof anyone in authority at Vanderbilt knew he was using his personal automobile on University business and there is no express provision in his employment contract for its use. Vanderbilt maintained a travel fund to reimburse employees traveling on University business. Dr. Seyfert had been reimbursed for plane travel on University business from this fund. However, it was not the practice of the Physics and Astronomy Department to reimburse for local travel, the travel fund was for travels to distant points. Dr. Seyfert discussed travel reimbursements with Dr. Lagemann who advised him of the policy.

Defendant contends these two issues must be decided for it because the evidence relied on by plaintiff to prove

Dr. Seyfert was on a trip to get and return observatory equipment to the observatory, and to meet a visiting professor at the airport and take him to the observatory is, hearsay and inadmissible on objection under Frank v. Wright, 140 Tenn. 535, 205 S.W. 434. But, that even if the evidence is competent as an exception to the hearsay rule, it does not prove Dr. Seyfert was on the business of Vanderbilt University at the time.

■ We cannot agree that the testimony of plaintiff and Mr. DeWitt of Dr. Seyfert's stated plan and course of action is hearsay evidence, and that it should have been excluded on Frank v. Wright, 140 Tenn. 535, 205 S.W. 434. That case held the statement of an employee made sometime after an accident that he was on his master's business was inadmissible. The court found the statement was not a part of the res gestae and came within no exception to the hearsay rule. The declarations of Dr. Seyfert in this case do not come within the strictures of that case. Dr. Seyfert's declarations of intention were made to plaintiff and Mr. DeWitt shortly before he set out on the trip which ended in his death. Such declarations have been held to be admissible in Tennessee as exceptions to the hearsay rule in Ford v. State, 184 Tenn. 443, 201 S.W.(2d) 539; Carroll v. State, 22 Tenn. 315; Kirby v. State, 15 Tenn. 259, and in number of other cases.

Under these authorities it is clear the evidence was admissible for the consideration of the jury.

■ Defendant contends Mrs. Seyfert's testimony as to Dr. Seyfert's declarations was properly excludable under T.C.A. sec. 24-105, as a transaction with or statement by her intestate. Plaintiff contends the testimony is admissible since Mrs. Seyfert sued both as widow and

as executrix to recover an insurance policy benefit and cites Baker v. Baker, 24 Tenn.App. 220, 142 S.W.(2d) 737; Kurn v. Weaver, 25 Tenn.App. 556, 161 S.W.(2d) 1005, and T.C.A. secs. 26-214 and 56-1108.

Section 56-1108 provides that a husband's life insurance shall inure to the benefit of his widow and children, so as not to be a part of his estate. American Trust & Banking Co. v. Leslie, 171 Tenn. 561, 106 S.W.(2d) 551, 111 A.L.R. 59 holds the term "life insurance" includes accident insurance and the proceeds of such a policy inure to the benefit of the widow; that the statute is to be liberally construed so as to advance the remedy the legislature intended to afford.

T.C.A. sec. 26-214 exempts from the claim of creditors and from execution, attachment or garnishment, the death benefit of accident policies "in the same manner as provided in secs. 56-1108, 56-1110." And, sec. 26-216 provides for a liberal construction of this statute.

In Baker v. Baker, this Court held that in a suit against her deceased husband's representative to establish her right to share in the estate a dissenting widow could testify to conversations and transactions with decedent, the statute of exclusion being subject to strict construction and the widow's action being in the nature of a proceeding on an issue of devisavit vel non in which such evidence was admissible under decided cases.

It was held in Kurn v. Weaver, a suit by an administratrix under the Federal Employers' Liability Act, plaintiff could testify to statements of her decedent, the court stating:

"Construed in the light of the object sought to be accomplished, we think the provision necessarily con-

templates only those cases wherein judgment may be rendered for the representative party and against the proposed witness, or vice versa.'' 25 Tenn.App. 580, 161 S.W.(2d) 1021.

This ruling was predicated on the provisions of the Federal Employers' Liability Act designating the beneficiary thereof in case of death covered by the act.

Since in this case the recovery would not go to the estate but to statutorily designated beneficiaries, and the judgment would not be for or against Mrs. Seyfert as personal representative, her interest as such being nominal, the estate having no interest whatsoever in the res of the action, the insurance proceeds, we are of opinion the statute does not apply. (See Miller v. First Natl. Bank of Linton, 62 N.D. 122, 242 N.W. 124; 97 C.J.S. Witnesses sec. 137; Pugh v. Turner, 145 Tex. 292, 197 S.W.(2d) 822, 172 A.L.R. 707; St. Louis Union Trust Co. v. Hammans, 204 Ark. 298, 161 S.W.(2d) 950.

In any event the admission of this testimony of Mrs. Seyfert would be harmless error in view of Mr. DeWitt's testimony to the same effect.

Turning to a consideration of this evidence, we believe it made a jury question as to whether Dr. Seyfert was discharging his admitted custodial duties with respect to the equipment of the Observatory at the time he was killed, and so was acting in the scope of his employment.

Again drawing the inferences from the proof most favorable to the plaintiff, these tend to show Dr. Seyfert was killed on a route which was unrelated to his employment as a weather forecaster by WSM, but was on a route on which he would naturally travel in going to Mr.

DeWitt's house for the equipment; equipment of which Mr. DeWitt as an associate researcher on the Vanderbilt faculty, working with Dr. Seyfert, was properly in possession. And so, the movement of it back and forth between Mr. DeWitt's home laboratory (which he maintained at his home for work on these projects) and the Observatory could well be within the scope of Dr. Seyfert's employment, and so he was on the business of Vanderbilt University at the time of his death. This certainly made a jury question as to whether he was acting within the scope of his employment.

As to the third contention, we are of opinion it was for the jury to say whether Dr. Seyfert's death resulted from a hazard to which he was exposed "in the course of his employment". The reasonable inferences from the evidence are that Dr. Seyfert's contract of employment as a professor and as custodian of the Observatory contemplated not only the maintenance of the status quo at the Observatory, but contemplated and required his collaboration with such faculty researchers in astronomy as Mr. DeWitt, and the exchange of the university equipment between them. The proof shows that a workshop was maintained at the Observatory for the manufacture of Observatory equipment, (we take it additions to and improvements on certain parts of the telescope apparatus), which would contemplate the securing of materials, etc. Additionally, there is the fact the Observatory was nine miles from the University, located on a 1,000 to 1,100 ft. hill in an area unserved by any public transportation system. Certainly the University even though it might not provide specific compensation, expected him to do the usual and necessary things in carrying out his duties and if this required the use of an automobile, this would be within the scope or course of his employment.

We doubt if Dr. Seyfert, in discharging his duties to the Observatory and Vanderbilt would be in the same status as another teacher or employee who might leave the campus to go to his home carrying exam papers, or such. This argument is made but we do not think it applies. All that is required of such a teacher is that he be at the school when due there. Vanderbilt, having no official connection with or interest in the place from which he leaves for the school or returns from the school and requiring no duties of him in regard thereto, would have no official interest in the trip.

But that was not the case with Dr. Seyfert's employment. He was not only required to be at the Observatory at all times or arrange for suitable supervision and custody in his absence, but his broad discretion as a professor and as custodian might reasonably contemplate the movement of observatory equipment from the observatory to research assistants, and vice versa, so that the University could have an interest in such a trip.

Suppose Dr. Seyfert needed material on which to work in the workshop to make needed changes in the telescope equipment and had been killed on a trip to pick up this material. Could it fairly be argued that this was so clearly not in the course of his employment as that all reasonable minded persons could and would agree thereon, and a verdict should be directed on it? We think not. And it must be conceded a trip to retrieve laboratory equipment properly in the possession of a coworker would be of the same nature as a trip to get materials to do work on the telescope. We think it was for the jury to say whether his contract of employment, which is silent on the subject of automobile use, reasonably contem-.

plated its necessary use from time to time in discharging his duties.

The fact it was the policy of the Physics and Astronomy Department not to compensate for such use of an automobile cannot have the effect of completely refuting the inferences which might be drawn from plaintiff's proof on this subject. At best, that proof was simply one of the facts on defendant's side to be considered by the jury in passing on this issue.

To bolster these conclusions by the citation of some authorities, we refer to 57 C.J.S. Master and Servant sec. 570, which bears this headnote:

"b. 'Scope of Employment' and Similar Terms

The terms 'scope of employment,' 'scope of authority,' 'course of employment,' and similar terms are often used indiscriminately and interchangeably, and, while these terms have been said to have no fixed legal meaning, they are to be accepted in their ordinary sense."

It is of interest the only case noted under this section drawing a distinction between the terms "scope of employment" and "course of employment" holds that an act which is committed in the "course of employment" is not necessarily an act committed within the "scope of employment." Thus indicating the term "course of employment" is broader and more inclusive than the term "scope of employment". Comfort v. Monteleone, La.App., 163 So. 670.

In Sandlin v. Komisar, 19 Tenn.App. 625, 93 S.W.(2d) 645, this subject is discussed thusly:

"The phrase 'in the course or scope of his employment or authority,' when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business. Vartanian on Automobiles, 405, sec. 121.

■ An attempted limitation is that in order for an act to fall within the 'scope of employment,' it (1) must be done in furtherance of the master's business or incident to the performance of the duties intrusted to the servant by the master; (2) must be done in the prosecution of the master's business or in executing his orders or doing his work; (3) must be connected with some mission or the performance of some service for the principal; (4) where the act is necessary to accomplish the purpose of the employment and intended for that purpose." 19 Tenn.App. 627-628, 93 S.W. (2d) 647.

■ What we have said disposes of all material issues arising on the second trial except assignments of error with respect to the action of the trial court in ruling inadmissible the evidence offered by defendant for the purpose of limiting the definition of the word "Travel" as it appeared in the policy to travel to a distant point.

On the second trial this evidence was excluded on the ground it was inadmissible under the parole evidence rule. Error has been assigned on this.

We have concluded the trial judge acted properly in applying the parole evidence rule to the testimony excluded.

■ It is settled law that when parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate inte-

gration of that contract, evidence, whether parole or otherwise, of antecedent understandings, etc., will not be admitted for the purpose of varying or contradicting the writing. 4 Williston on Contracts (3d Ed.) sec. 631, p. 948; 3 Corbin on Contracts sec. 573, p. 357; Marron v. Scarbrough, 44 Tenn.App. 414, 314 S.W.(2d) 165; McGannon v. Farrell, 141 Tenn. 631, 214 S.W. 432; Litterer v. Wright, 151 Tenn. 210, 268 S.W. 624; McQuiddy Printing Co. v. Hirsig, 23 Tenn.App. 434, 134 S.W.(2d) 197.

While it is likewise the rule as contended by plaintiff-in-error that in contract cases evidence as to prior negotiations between the contracting parties may be looked to to determine the meaning of the terms and provisions of the contract, Turner v. Zager, 50 Tenn.App. 674, 363 S.W.(2d) 512; Bailey v. Brister, 49 Tenn.App. 191, 353 S.W.(2d) 564; Commerce Street Co. Inc. v. Goodyear Tire & Rubber Co., 31 Tenn.App. 314, 215 S.W. (2d) 4, it, obviously, is not the intention of the law that this rule shall emasculate the parole evidence rule. So, it necessarily follows that when contract provisions are plain, clear, and unambiguous, and the terms employed therein are of such everyday import and understanding as not to require elaboration or explanation, then proof of prior negotiations will not be heard with respect to their meaning. The very simple reason for this rule is, of course, that parole evidence or other evidence of prior negotiations in such a case can only have the effect of varying or altering or contradicting the effect of the written instrument contrary to the parole evidence rule. Petty v. Sloan, 197 Tenn. 630, 277 S.W. 355.

So, two questions arise: (1) Is the contract so written and of such subject matter as to require or permit explanation, and (2) would the proof of prior negotiation

aid in interpretation or would it have the effect of contradicting or altering or varying the written contract?

We are satisfied from an examination of the supplemental automobile coverage rider, and the balance of the contract, that it is so plain, clear and unambiguous and its subject matter is of such a nature, that there is really no necessity for proof in aid of interpretation.

Moreover, it seems clear the purpose of the proffered evidence is not explanatory for the purpose of interpretation but that its real purpose and effect is to prove that the contract does not mean what it rather clearly says that it means, and thus would have the effect of contradicting or altering or varying the tenor, import and effect of the contract.

Accordingly, we agree with the trial judge that this contract being fully integrated and containing an express stipulation that it constituted the entire agreement between the parties, could not be altered or limited by evidence of prior negotiation.

In this connection we point out that the defendant insurance company actually went to some pains to see to it that the parole evidence rule would apply to its policy contract. This was the real purpose of the company in spelling out in express terms the fact that the policy constituted the entire agreement between the parties in the provision:

"Entire Contract; Changes: This policy, including the application of the Employer, the individual applications of the Employees insured hereunder, if any, and the endorsements constitute the entire contract of insurance. All statements made by the Employer or by any of the Insured Employees shall be deemed rep-

resentations and not warranties and no such statement shall avoid the insurance or reduce the benefits under this policy or be used in defense of a claim hereunder unless it is contained in a written application signed by the applicant. No change in this policy shall be valid until approved by an executive officer of the Company and unless such approval be enforced hereon or attached hereto. No agent has authority to change this policy or to waive any of its provisions."

Just as we think the insurance company would be entitled to rely on the parole evidence rule in a case against it on this policy on account of this provision, we think the plaintiff can here. Actually, what defendant proposes to do, to limit the coverage by parole evidence, contrary to the parole evidence rule, would set a very dangerous precedent, one which this insurance company, and all others, would come to regret very much, if it ever became permissible.

All assignments of error are overruled and the judgment of the trial court is affirmed with costs.

Shriver and Chattin, JJ., concur.