SOUTHERN RAILWAY COMPANY, v. BEN SLOAN,
Administrator of the Estate of Randy Sloan, Deceased.

SOUTHERN RAILWAY COMPANY, v. BEN SLOAN.

SOUTHERN RAILWAY COMPANY, v. BEN SLOAN,
Administrator of the Estate of Ruth Galyon Sloan,
Deceased.—407 S.W.(2d) 205.

Eastern Section. November 23, 1965.

Certiorari Denied by Supreme Court June 20, 1966.

Key & Lee, Knoxville, for plaintiff-in-error, Southern Ry. Co.

J. D. Lee, Madisonville, and Eugene G. Hale, Athens, for defendants-in-error.

COOPER, J. Ruth Galyon Sloan and her nine year old son, Randy, were killed in an automobile-train collision, which occurred on December 16, 1963 at the Brickyard Road grade crossing in the unincorporated town of Powell, Tennessee.

Ben Sloan, the husband and father, qualified as administrator of the estates of the two decedents and brought suit against the Southern Railway Company in an effort to recover damages for their wrongful death. He also filed suit, in his own name, to recover damages for the destruction of his automobile.

Upon the trial, the jury awarded plaintiff verdicts in all three suits—the estate of Ruth Galyon Sloan being awarded $103,923.00, the Randy Sloan estate being awarded $76,105.00, and Ben Sloan being awarded $1610.00 for damage to the automobile. The trial court suggested a $26,105.00 remittitur of the award to the Randy Sloan estate, and, when it was accepted, overruled defendant's motions for a new trial.

The defendant perfected its appeal, directing its numerous assignments to the trial court's refusal to direct a verdict in favor of the defendant, the amount of the verdicts, and alleged errors in the court's charge.

The record shows that Powell, Tennessee is a populous, though unincorporated, community of approximately 3500 people in Knox County. The main line track of the Southern Railway Company between Knoxville and Oakdale, Tennessee passes through Powell, and there are three grade crossings in the community. The crossing furthest to the west, and the one where the accident occurred, is known as the Brickyard Road crossing.

As constructed, and from the point of view of a train crew travelling in a westwardly direction, the crossing lies in a long, sweeping curve to the left which restricts the train crew's view of obstructions on the crossing to a distance of between 500 to 600 feet. From the point of view of a motorist travelling south on Brickyard Road, the crossing lies on the crest of a small rise, the highest point being the south rail or timber of the crossing. For vehicular traffic moving south, the grade is gradual until the far rail or timber is reached, and then the road falls away sharply.

The frequency of the public's use of the Brickyard Road crossing is not specifically shown in the record; however, there is evidence that a high school is to the south of the crossing, and a grammar school is a few blocks from the crossing to the north. As a consequence, the crossing is used by school busses, teachers at the schools, as well as by those residing near the Brickyard Road crossing.

Several witnesses testified that the grade and construction of the railroad crossing was such that their automobile would scrape or drag as it crossed the tracks. Charles E. Muzzall, who travelled the crossing with regularity, testified that the severity of the drag was dependent upon the angle the automobile crossed the tracks.

James G. Peters, a school custodian, testified that he had driven the Sloan automobile across the Brickyard Road crossing on several occasions, the last being only 4 days before the accident, and that the underside of the automobile had scraped on some part of the crossing. On the last trip, the impact was so severe that he was afraid he had damaged the automobile.

Other witnesses testified that an examination of the timbers paralleling the rails in the crossing revealed that they had been "gouged" by heavy objects and that the bolts holding the timbers had been caught on something and had been bent in the direction the object was moving.

In contradiction, the defendant introduced photographs and movies of an automobile passing over the crossing showing 3 to 4 inches of clearance between the rails and timbers and the underside of the automobile.

On the day of the accident, the Sloan automobile was observed moving southwardly on Brickyard Road toward

the crossing at a slow rate of speed. No one observed the automobile as it started across the tracks, but several witnesses saw it stopped on the tracks, and the train approaching with its bells ringing and horn blowing. These witnesses were unable to testify as to whether the automobile engine had stalled; however, James A. Byrge, an automobile damage appraiser who examined the Sloan automobile after the accident on instructions from the defendant Railway Company, testified unequivocally that damage to the radiator by the engine fan showed that the motor was running at the moment of impact.

All witnesses, including members of the defendant's train crew, agree that as the train approached the stopped automobile, Mrs. Sloan was making a frantic effort to get her son out of the automobile and that he had reached the ground before the impact. Mrs. Sloan was still in the automobile when the collision occurred.

Mr. O. A. Yarnell, the engineer operating the train, testified that he approached the Brickyard Road crossing at a speed of approximately 35 miles per hour, and, when he was from 400 to 450 feet from the crossing, he saw the Sloan automobile approximately 25 feet north of the crossing "moving very slowly. It was coming down to the crossing as though to stop, but I couldn't say how many miles an hour * * *". Yarnell testified that he continued to watch the automobile until the accident happened; that, in his opinion, the Sloan automobile momentarily stopped, "then just kept easing on and when I saw she was going to be too close if she stopped at that time why I went into emergency," but was unable to stop the train until it had passed 1200 to 1300 feet (the length of 22 freight cars plus the length of 2 or 3 diesel units) beyond the crossing.

Mr. Yarnell's testimony was corroborated substantially by the testimony of Mr. Emanuel Martin, the brakeman riding in the engine.

The testimony of Charles Roach, the fireman on the engine, was in direct conflict with that of the other two members of the train crew on several material points. Mr. Roach testified that the train crew first could see the crossing from a point approximately 600 feet away; and that, *at that moment,* he saw the Sloan automobile stopped on the tracks. Roach did testify that Mr. Yarnell applied the emergency brakes immediately after Roach had called to him and told him of the presence of the automobile.

William R. Norman, who was working in his yard some 300 to 400 feet from the Brickyard Road crossing, testified that the train appeared to slow as it passed him, but that he did not hear the sounds of the emergency application of brakes until the approximate moment of impact.

 We have pointed out repeatedly that in reviewing a case on appeal, where the appeal is from a judgment based on a jury's verdict, we do not weigh the evidence to determine the preponderance thereof, nor do we decide the credibility of witnesses. McAmis v. Carlisle, 42 Tenn. App. 195, 300 S.W.2d 59. Our review is limited to a determination of whether there is any material evidence to support the verdict, and "it [our review] must be governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict." D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S.W.2d 897. And if there is

material evidence to support the verdict it must be affirmed. City of Chattanooga v. Ballew, 49 Tenn.App. 310, 354 S.W.2d 806, and numerous cases there cited.

Considering the evidence in this cause in the light of the above authorities, we think the jury reasonably could have found that Mrs. Sloan's automobile ''drug'' on the crossing and in some manner became caught or entrapped, placing her and her son in a position of peril— this conclusion, in our opinion, would be compatible with evidence that the automobile engine was running at the moment of impact, and with the undisputed evidence that Mrs. Sloan was not trying to drive off the tracks but was trying to get her son out of the automobile and out of the path of the train.

We are further of the opinion that the jury reasonably could have found that after the Sloan automobile had stopped in a position of peril, whatever the cause of the stop, the defendant's engineer did not see the automobile until it was called to his attention by a member of his train crew, and that he did not go into emergency until the approximate moment of impact.

From these findings, we think the jury reasonably could conclude that the defendant railroad was guilty of negligence in the construction of the railroad crossing, and that its engineer was guilty of negligence (a) in failing to keep a proper lookout for automobiles travelling on the public street over the improperly constructed crossing, and (b) in failing to take reasonable steps to avoid the collision after he knew, or should have known that the Sloans were in a position of peril; and that the several acts of negligence, or any one of them, was the proximate cause of the accident and resulting deaths and damages.

■ In defendant's brief, the argument is advanced that the accident was unavoidable so far as the defendant was concerned, defendant's position being that the undisputed proof shows that the train could not have been stopped short of the crossing even if the engineer had seen the Sloan automobile and had applied the brakes at the moment the train came into view of the crossing. This is a specious argument which loses substance when considered in the light of evidence that, without an early emergency application of brakes, Randy Sloan was able to get out of the car before the impact occurred. How much more time did he need to run 8 to 10 feet to safety? How much more time did Mrs. Sloan need to follow? We think it was for the jury to decide if an early emergency application of brakes would have retarded the speed of the train sufficiently to give this time.

■ Then too, and more important, defendant's position ignores evidence which we think supports the jury's finding that the Sloans were placed in a position of peril by the negligence of the defendant in the construction of the crossing. Having placed the Sloans in a position of peril, the defendant could not escape liability on its plea that after discovering the Sloan's peril, it did not have time or distance enough to avoid the natural result of its negligence.

The several assignments of error arising out of the trial judge's action in overruling defendant's motions for a directed verdict, therefore, are overruled.

In assignments 7, 8 and 9, the defendant insists that the trial court erred in refusing to give requested special instructions setting forth the duty of the driver of a motor vehicle approaching and entering onto a railroad crossing, and the duty of the locomotive engineer who

observes a motorist approaching the crossing at a reasonable rate of speed and with her automobile under apparent control.

█ We think the trial court's general charge adequately covers the points set out in the requested instructions. But if not, there is no showing, and we are not convinced from reading the entire record, that the failure to give the requests, or any of them, affirmatively affected the result of the trial. T.C.A. sec. 27-117; De Rossett v. Malone, 34 Tenn.App. 451, 239 S.W.2d 366, 378.

The final two assignments of error are directed to the amounts of the judgments. The defendant contends that "the verdicts are excessive, and so excessive as to indicate passion, prejudice and unaccountable caprice on the part of the jury."

█ The parties stipulated that Ruth Galyon Sloan was killed instantly, and that Randy Sloan died two hours after the collision without regaining consciousness. Under the stipulation, the amount of damages recoverable would be "the pecuniary value" of the lives of Ruth Galyon Sloan and Randy Sloan, together with any medical or burial expenses. T.C.A. sec. 20-614.

█ The pecuniary value of the life of a decedent is to be determined in an action for wrongful death from evidence of the decedent's expectancy of life, his age, condition of health and strength, capacity, if any, for labor and for earning money through skill in any art, trade, profession, occupation, or business and his personal habits as to sobriety and industry. Davidson Benedict Co. v. Severson, 109 Tenn. 572, 72 S.W. 967; Memphis Street Railway Company v. Cooper, 203 Tenn. 425, 313 S.W.2d 444.

The record shows that at the time of death, Mrs. Sloan was 41 years of age, in good health, sober in habits, very industrious, and with a life expectancy of 36.4 years. Mrs. Sloan did all of her housework, and also worked as a full-time teacher in the Knox County School System at an annual salary of $4507.00. Her earnings as a school teacher would increase automatically as she completed additional years of service in the system.

Dr. John R. Moore, a statistician, testified that the present value of the future earnings of Mrs. Sloan, discounted at 3%, was $133,199, and, using a 6% discount factor, the present value was determined to be $88,520.00. Dr. Moore's computations were based on the assumption that Mrs. Sloan would accept retirement at age 60, rather than at the compulsory retirement age of 70, and that she would not have received any increase in wages other than those based on longevity in the Knox County School System.

The jury returned a verdict of $103,923.00 as damages for the wrongful death of Ruth Galyon Sloan, which was approved by the trial court in overruling defendant's motion for a new trial.

■ Bearing in mind the oft-stated truism that the amount of the verdict in a tort action is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence, we can not say that the amount awarded as damages for the wrongful death of Ruth Galyon Sloan was excessive. Cf. Southeastern Aviation, Inc., v. Hurd, 209 Tenn. 639, 355 S.W.2d 436.

 In the Randy Sloan case, the record shows that at the time of his death, Randy was 9 years of age, in good health, and had a life expectancy of 60.8 years. The record further shows that he was an industrious youth with good personal habits.

Based on this evidence, the jury returned a verdict of $76,105.00, of which $1105 represented burial expenses. The trial judge suggested a remittitur of $26,105.00, which was accepted by the plaintiff without protest. The defendant insists that the verdict, as reduced, is still far in excess of the amount awarded as damages for the wrongful death of a minor in other cases approved by this court.

 "The question of the excessiveness of a verdict is generally one for the determination of the trial court in the first instance, and its action in granting or refusing to grant a new trial on that ground will not be disturbed on appeal unless an abuse of discretion is shown," 15 Am. Jur., Damages, Sec. 205, p. 622, quoted with approval in Monday v. Millsaps, 37 Tenn. App. 371, 264 S.W.2d 6, and Town of Clinton v. Davis, 27 Tenn.App. 29, 177 S.W.2d 848.

 There is no exact yardstick, or measurement, which this court may use as a guide to determine the size of verdicts which should be permitted to stand in cases of this kind. Each case must depend upon its own facts and the test to be applied by us is not what amount the members of the court would have awarded had they been on the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is patently excessive. The amount of damages awarded in similar cases is persuasive but not conclusive, and, in evaluating the award in other cases, we should note the date of the

award, and take into consideration inflation and the reduced value of the individual dollar. This we have done in the present case, and have concluded that we can not say the jury's verdict, as reduced by the trial court, is excessive.

The judgments entered in these cases in the trial court are affirmed. Costs incident to the appeal are adjudged against the defendant, and its surety.

McAmis, P. J., and Parrott, J., concur.