DR. J. W. OSBORNE, Plaintiff-in-Error, v. NORMAN
FRAZOR et al., Defendants-in-Error.—425 S.W.(2d) 768.

Middle Section. January 5, 1968.

Certiorari Denied by Supreme Court March 18, 1968.

Hooker, Hooker & Willis, Nashville, Harsh, Kelly & Harsh, Gallatin, for plaintiff in error.

W. T. Goodall, Jr., Gallatin, for defendant in error.

TODD, J. This is an appeal by the defendant, J. W. Osborne, M. D., from a jury verdict and judgment for plaintiffs in a malpractice case.

The original plaintiff was Mrs. Effie Frazier (Frazor), but she died shortly after suit was filed, and her children, Norman Frazor and others, were duly substituted as plaintiffs.

The case has been tried three times. During the first trial a verdict was directed in favor of the defendant, Osborne, and another defendant, a hospital, on grounds of the running of the statute of limitations. In the published opinion of Frazor v. Osborne, 57 Tenn.App. 10, 414 S.W.2d 118 (1966) this Court affirmed the action of the trial judge in respect to the hospital and reversed as to the physician, holding:

"Bearing in mind that there is evidence in this case to indicate that the professional relationship between the decedent and the defendant, Dr. J. W. Osborne, did not cease until the discovery of the imbedded sponge in May 1961, or sometime after that, it is our view that the evidence is such that the question of whether or not this professional relationship did continue until within one year of the filing of the suit is one that should have

been submitted to the jury, and, if found by the jury that said relationship continued until within the statutory period of one year, the question of liability for negligence would have been for the jury to decide." 57 Tenn.App. at 20, 414 S.W.2d at 123.

Upon remand and retrial, the only defendant before the court was J. W. Osborne, M. D.

At the second trial the jury was unable to agree and a mistrial was entered. A wayside bill of exceptions was preserved by defendant and is a part of the record of this appeal.

At the third trial, a jury verdict and judgment were rendered in favor of the plaintiffs and against the defendant for $8,000.00 compensatory and $1,000.00 punitive damages. Defendant's motion for a new trial was overruled and he has appealed in error, assigning errors in both second and third trials.

There is evidence in the record of each of the trials to justify a finding of the following facts:

In December, 1952 deceased suffered a broken hip and was taken to the office of defendant who sent her to the hospital for surgery which was performed by a specialist, assisted by defendant.

Approximately twelve months later, deceased was readmitted to the hospital for additional hip surgery during which a surgical sponge was left in deceased's hip without her knowledge.

The incision failed to heal and produced pain, foul odor and drainage until May, 1961 when a few threads began to protrude from the wound, and the sponge was

discovered and removed. The wound healed promptly thereafter.

During the entire period from surgery until discovery and removal of the sponge, the deceased was under the professional care of the defendant.

■ In accordance with the established practice, the second and third trials will be considered separately and in the order in which they occurred. Phipps v. Carmichael, 52 Tenn.App. 471, 376 S.W.2d 499 (1963).

The first assignment of error is:

"1. It was error of the court, during the second trial, to overrule the defendant's motion to strike the second count from plaintiff's declaration."

The motion to strike and entire argument thereon was as follows:

"Your honor, comes now the defendant at this time and moves, first, to strike the Second Count of the declaration which is based upon a contractual relationship, which I think was not proved, and certainly not the theory of this lawsuit in the recent Court of Appeals case."

After the first trial, appeal therefrom, and remand, the plaintiffs filed an "Amended Declaration" which was apparently the basis of the second and third trials. Neither the second count of the first declaration, nor the second count of the "Amended Declaration" refers to any contractual relationship. The designation of the second count in defendant's motion was evidently an inadvertence of counsel. We cannot correct counsel's inadvertence in this court by assuming that he meant what he did not say. Neither can we assume that during

the trial the court and counsel understood that he meant what he did not say, namely, the third count of plaintiff's declaration.

█ Defendant has not mentioned this assignment in his brief and argument. However we have examined same and found it to be without merit. *The voluntary acceptance of the physician-patient relationship by the affected parties certainly creates a prima facie presumption of a contractual relationship.*

The relationship of physician or surgeon and patient is one arising out of a contract, express or implied. 70 C.J.S. Physicians & Surgeons, sec. 37.

The relation of "physician and patient" is created when the professional services of a physician are accepted for a purpose of medical or surgical treatment, the relation being a contractual one, wherein patient knowingly seeks assistance of a physician and physician knowingly accepts him as a patient. Findlay v. Board of Supervisors, 72 Ariz. 58, 230 F.2d 526, 24 A.L.R.2d 841 (1951).

The Hippocratic Oath, by which every doctor is morally bound, assumes a preexisting relationship with patient and physician, which relationship in its inception is basically contractual and wholly voluntary, created by agreement, express or implied, and by its terms may be general or limited. Agnew v. Parks, 172 Cal.App.2d 756, 343 P.2d 118 (1959)

█ The general verdict in favor of the plaintiff, without separate verdicts on separate counts, is presumed to rest upon a valid count, and will not be set aside, even though one count be defective. 20-1317, 1318 T.C.A. and cases annotated thereunder.

The defendant's first assignment of error is respectfully overruled.

Defendant's second assignment of error is:

"2. It was error for the trial court, during the second trial of this cause, to fail to sustain the defendant's motion for a directed verdict made at the close of all the evidence."

The motion, presented orally and preserved in the wayside bill of exceptions, appears to have been upon the grounds that there was no evidence of negligence to support a verdict for the plaintiff and that plaintiff's suit was barred by the statute of limitations. The brief and argument of defendant in this court does not mention statute of limitations. The evidence presented at the second trial is adequate to subject this insistence to the holding of this court on the previous appeal (quoted supra). Therefore the statute of limitations need not be discussed further. We shall confine our consideration to the propositions advanced in defendant's brief and argument, the first of which is:

"I. The Standard of Care required of Physicians."

Defendant cites Redwood v. Raskind, 49 Tenn.App. 69, 350 S.W.2d 414 (1961) and Glover v. Burke, 23 Tenn.App. 350, 133 S.W.2d 611 (1938) for the general proposition that the standard of professional skill and care by which to measure the actions of a physician must be established by expert testimony. The brief and argument of plaintiffs appears to concede this general proposition of law in the following language:

"The dispute between the parties did not involve the question of defining the standard of care—that stand-

ard was clearly and undisputably defined by experts."
Appellee's argument, p. 16.

The initial inquiry is, therefore, what was the evidence at the second trial which defined the standard of professional care.

Dr. Don Eyler, a witness for the defendant, testified as follows:

Q. If Dr. Osborne testified that he insisted that Mrs. Frazor return to your office for additional examinations and so forth, and that he repeatedly told her that he could not take care of her hip but that he was only taking care of other ailments she had and that she should return to you, is that proper and reasonable care?

A. Yes.

* * * * * *

Q. I'll ask you in your opinion as a specialist, an orthopaedic specialist, are you familiar with the skill and knowledge of the average general practitioner in the town of Hendersonville?

A. Yes.

Q. Do you think it would have been proper that Dr. Osborne probe or go into the wound that you were caring for on Mrs. Frazor?

A. Well, I stated this before in a deposition in my office, and my feeling about the matter is that I would prefer that he would send the patient back to me since it was my case. Some general practitioners are, I should say, bolder than others; but

if one of my patients had a draining sinus and if it didn't clear up in a reasonable period of time, I would have preferred that the patient be sent back to me rather than have the general practitioner operate on the patient in any way. (WBE 82, 83)

Q. Doctor, as Doctor Osborne visited this lady as a general practitioner, should he have discovered that gauze on the visits that he made?"

A. Well, that's kind of putting me on the spot. As I said, when a physician sees a draining sinus, he suspects infection or foreign body. * * * (WBE 57)

The testimony of the defendant himself is somewhat enlightening as to his own estimate of his duties.

"I had not been trained in major orthopaedic surgery; knew nothing about it, and certainly never attempt to do something in my medical practice that I have no training for." (WBE 103)

\* \* \* \* \* \*

Q. According to your memory did you call Dr. Eyler about this?

A. I did. (W.B.E. 106)

Q. Did you insist that she go back for the care of her hip to Dr. Eyler?

A. I certainly did.

Q. Did you tell that to the family?

A. To the family and to the patient repeatedly. (W.B.E. 108)

My diagnosis was osteomyelitis, which is infected bone.

* * * Certainly there would be no reason to take a culture on that because you do not cure osteomyelitis with antibiotics. It's a surgical procedure * * * major surgical procedure, not to be done in the home. (W.B.E. 119)

I might dress the wound if I had sterile supplies in my bag. * * * but I never at any time assumed care of the hip or even intimated to them that I was caring for the hip. At all times I referred them * * * that this was Dr. Eyler's field, and that Dr. Eyler was treating it, and to get in touch with Dr. Eyler. (W.B.E. 120)

* * * * * *

* * * When I'd see the wound still draining, I'd urge them again to see Dr. Eyler about it. (W.B.E. 123)

Q. Now, let me ask you this. After you'd go out there and find this hip condition that everybody has testified about, would you then call Dr. Eyler and take it up with him and say, "This lady needs * * *."

A. I did several times. (W.B.E. 124, 125)

* * * * * *

Q. And that's what he would do when you would call about her?

A. Yeah. Say, "Send her in." * * * It must have been half a dozen times.

In response to a long hypothetical question detailing defendant's version of his own behavior Dr. Troutt testified that such behavior was in accordance with the skill

and knowledge of the average general practitioner in the area. (W.B.E. 131, 132, 133)

Dr. Troutt also testified that the symptoms would have suggested the presence of a foreign body, and that he would have insisted that the patient return to Dr. Eyler because "I would have felt that that was out of my realm of treatment." (W.B.E. 134)

Dr. Wallace, of Gallatin, testified to the same effect, including:

"* * * it's my understanding that he referred this patient back to the operating surgeon, which was quite proper that he do so."* * * (W.B.E. 142.)

Thus the defendant and his witnesses, Drs. Eyler, Troutt, and Wallace were agreed that the condition of an unhealed and draining wound following orthopaedic surgical procedure would be beyond the capacity of a general practitioner and ought to be referred back to the orthopaedic surgeon for specialized diagnosis and treatment.

In 132 A.L.R. 392 is found the following general statement:

"It may be stated as a general rule that, as a part of the requirements which the law exacts of general practitioners of medicine and surgery, or other schools of healing, if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the

situation to his patient, or advise him of the necessity of other or different treatment."

The many cases analyzed under this annotation support the insistence of the plaintiff, the admission of the defendant, and the testimony of the defendant's witnesses that the chronic, persistent condition of the patient in this case required the defendant to recommend treatment by specialist.

Since defendant's duty to refer his patient to more competent specialized medical authority was clearly established, the question remains, did the defendant perform that duty? He insists that he did. Repeatedly, he testified, he urged both the patient and various members of her family to submit the problem to Dr. Eyler. Several times, he says, he discussed the matter with Dr. Eyler.

On the other hand, the plaintiffs deny any effort of the defendant to enlist the aid of Dr. Eyler. On this subject, Dr. Eyler testified as follows:

Q. * * * During that ten year period would you examine your notes and see whether they reflect that Dr. Osborne called you about this lady's hip condition? Did I have you do that on the deposition? If I did, you can save yourself some time.

A. The answer is no. (W.B.E. 93)

\* \* \* \* \* \*

Norman Frazor and his wife, Herman Frazor and his wife, and Mrs. Mary Elizabeth Frazor Tillman each testified that defendant had never made any suggestion of reference to Dr. Eyler, but assured them that the condition of deceased was hopeless, permanent and incurable. They testified in effect that one or more of them

were present whenever the defendant visited deceased, and defendant himself testified that one or more of them were present on most if not all occasions when he insisted that the patient be taken to Dr. Eyler.

Mrs. Tillman testified in part as follows:

"I don't reckon he ever come to the house that I wasn't there."

\* \* \* \* \* \*

Q. You have heard the testimony, Mrs. Tillman, of Dr. Osborne to the effect that he instructed you, your family, and your mother on numerous occasions to return to Dr. Eyler. Would you tell the court and the jury whether or not you ever heard any such statements.

A. If he did, I never heard it.

Q. What comment would he make about the wound and her difficulty and whether or not she needed any treatment, or that it would ever get any better?

A. Well, he didn't make any in the house in front of my mother, but I asked him one day when he was out to see my dad and he looked at mother's leg, I asked him what he thought of mother's leg, and he said, "Well, if she is living twenty years from now, it will be running" \* \* \*. And I said, "Well in other words, you think it's malignant?" He said, "There's no doubt in my mind." And my husband also heard it. (W.B.E. 153.)

From a careful examination of the wayside bill of exceptions of the second trial, we are satisfied that there was evidence at that trial which would have justified the jury in finding the facts as insisted by the plaintiffs, that

is, that the defendant did not refer the patient to a specialist as it was his duty to do.

In respect to motions for directed verdict, the trial court and, on appeal, this Court does not weigh the evidence, nor judge the truthfulness of the witnesses, but must consider all the evidence, take the plaintiff's evidence as true, discard all countervailing evidence, take the strongest legitimate view of plaintiff's evidence, draw all reasonable inferences therefrom in plaintiff's favor, and deny the motion if there is any material determinative evidence to support a verdict for the plaintiff. Newark Insurance Company v. Seyfert, 54 Tenn.App. 459, 392 S.W.2d 336 (1964.)

The second assignment of error is respectfully overruled.

The third and fourth assignments of error, supported by the same brief and argument as the second assignment, reiterate the complaint that, in the third trial no standard of care was shown by plaintiffs and that the uncontroverted evidence showed that the defendant did in fact comply with that standard of care applicable to physicians in his classification and territory.

In response, the plaintiffs reiterate their insistence that a standard of care was shown in the third trial, but compliance with that standard was an issue of fact which was properly submitted to and decided by the jury.

During the third trial, plaintiff read from the deposition of Dr. Gillet the following:

Q. Do you know of any reason why it could not have been probed prior to May of 1961?

A. I do not know of any reason why it shouldn't have been. (Dep.—6)

Q. * * * You, as a general practitioner, if you had been going out there and seeing her, would you have urged her to return to see Dr. Eyler? Do you agree with that practice?

A. Certainly. (Dep.—10)

A long hypothetical question as to defendant's procedure, including, "insisted that Mrs. Frazor return to Dr. Don Eyler for another examination"—and inquiring if such was acceptable medical practice was answered affirmatively. (Dep.—13)

Q. * * * In your opinion, would it be consistent with proper medical care to permit an infected wound of this type to remain in existence for a period of some eight years without taking some affirmative action to see that the cause of the infection was determined, * * *?

A. I would say that if such an investigation hadn't been made previously that somewhere along this time I would certainly have tried to find out what was going on. (Dep.—19)

Dr. Don Eyler was asked a hypothetical question, including the insistence that the patient go to a specialist, and answered that this was good practice.

Dr. Eyler also testified as follows:

Q. * * * If you have a running sore in a surgical incision for ten years, good medical practice or

good veterinarian practice requires that you take some action, does it not?

A. Yes. (B.E. 105)

Dr. Troutt testified:

"I would have referred her to the operating surgeon. I would have insisted that she return to him." (B.E. 150)

Dr. Wallace answered a hypothetical question, including insistence that the patient return to Dr. Eyler, to the effect that such was consistent with good practice.

There was evidence in the third trial that the defendant did not in fact confer with Dr. Eyler or advise the patient or family to go to him.

Dr. Eyler testified that he had no record or recollection of any communication from defendant about the continued drainage from the (patient's) hip. (B.E. 104)

Again in the third trial defendant testified that he had repeatedly insisted that deceased return to Dr. Eyler, the specialist, that he had discussed the case with Dr. Eyler, and that his procedure was consistent with good medical practice.

He testified:

"I urged her every time I went by" (B.E. 129)

"I repeatedly urged her to go back and see Dr. Eyler." (B.E. 136)

Norman Frazor, Mrs. Norman Frazor, Mrs. Herman Frazor and Mary Elizabeth Tillman reiterated their testimony of the second trial that no suggestion or insistence was made that the patient return to Dr. Eyler.

We recognize the possibility that the defendant's recommendations and urgings might have been communicated directly and privately to the patient without knowledge of the family, but such is an improbable possibility. The circumstances of an aged, infirm, bedfast mother in the constant care of her children create the strong probability, even duty of recommendations being made to the family as well as the patient. At least, the jury was justified in so finding, and further finding, as plaintiffs insist, no such recommendation was made.

■■ As in the case of a refusal to direct a verdict, so in the case of a verdict approved by the court, this Court does not weigh the evidence or judge the truthfulness of the witnesses, but this Court must take the strongest legitimate view of the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict, and if there is material evidence to support the verdict it must be affirmed. Southern Railway Co. v. Sloan, 56 Tenn.App. 380, 407 S.W.2d 205 (1965).

The third and fourth assignments of error, relating to the third and last trial are respectfully overruled.

In the overall view of this case, we are not unmindful that a clain of unfortunate circumstances produced regrettable results which no one involved would have desired.

The presence of the sponge was not discovered until the time had expired for legally determining the responsibility of the surgeon and/or hospital.

The age, infirmity and remote residence of the patient were not conducive to adequate observation.

▐▌

Nevertheless, this case presents a situation of long and cumulative painful injury. It might have occurred without fault of defendant, but the jury found otherwise.

██ *Where a physician sets his own standard of professional competence and testifies that he measured up to that standard, but the jury finds from other evidence that the physician failed to do that which he himself considers proper and necessary, the physician cannot complain that the plaintiff has not proven negligence.*

Each of the assignments of error having been carefully considered and overruled, the judgment of the trial court is affirmed with costs.

Shriver, P. J., and Puryear, J., concur.