Richard R. RILEY, Joseph Sanella and George R. Aiken, Appellants,

v.

Arla Joan LAYTON, an infant, by her guardian ad litem, Arnold L. Layton, and Arnold L. Layton, Appellees.

No. 7347.

United States Court of Appeals Tenth Circuit.

March 5, 1964.

Rex J. Hanson, Salt Lake City, Utah (Ernest F. Baldwin, Jr., Salt Lake City, Utah, on the brief), for appellants.

Harriet Ross, San Francisco, Cal. (Melvin M. Belli, San Francisco, Cal., and Brigham E. Roberts, Salt Lake City, Utah, on the brief), for appellees.

Before MURRAH, Chief Judge, HILL, Circuit Judge, and KERR, District Judge.

HILL, Circuit Judge.

The appeal is from a judgment rendered in a diversity suit upon a jury verdict in favor of plaintiff-appellees awarding them damages in the amount of $78,-745.00 for malpractice on the part of defendant-appellants.

On Saturday, September 24, 1960, Arla Joan Layton, who was nine years old at the time, fell from a tree and fractured both bones in each of her forearms. Her father, Arnold L. Layton, took her to the Kane County Hospital at Kanab, Utah, which is owned and operated by the three appellants as a partnership clinic and hospital. She arrived at the hospital at about 5:00 P.M. and, shortly after her admittance, the appellant, Dr. Richard R. Riley, gave her emergency treatment and then proceeded to reduce the fractures. The child was anesthetized during the manipulation and setting which was completed at about 8:30 P.M. Thereafter, Dr. Riley applied a circular plaster cast with padding and a stockinette to each arm.

The child's mother remained at the hospital during that night and neither Dr. Riley nor either of his associates saw the patient until the following day at about 10:30 A.M., when Dr. Riley came to the hospital. At this time she was suffering pain and that condition continued through the day. Beginning at about 5:00 P.M. that day, and continuing throughout the second night, drugs were administered to relieve the pain. At about 12:30 A.M. on Monday morning and without seeing the patient, the appellant, Dr. George Aiken, by telephone directed the administration of more drugs to kill or relieve the pain. Mrs. Layton testified that when she saw the child on Monday morning the right hand was swollen considerably more than the night before and looked pale. When Mrs. Layton asked Dr. Riley about the swelling he replied that it would swell a.

lot more because of the padding he had placed around the wrist. Ultimately, the cast was removed but there is a conflict in the evidence as to when it was cut from top to bottom. Dr. Riley testified he cut it from top to bottom on Monday. The patient's mother testified he only partially cut the cast that day. In any event, the girl continued to suffer pain throughout the day on Monday and her fingers and hand were swollen and discolored. According to Mrs. Layton, the child's hand was so swollen that the fingers " * * * looked like they were sort of in a spasm, drawn and in different directions." The pain continued throughout the third night.

On Tuesday at 12:30 A.M. the appellant, Dr. Sanella, was summoned to the hospital to see the patient. He noted that the fingers of her right hand were blue and found her " * * * crying and difficult to manage * * *." He had ordered another kind of a drug administered to her to alleviate the pain before he saw her. The nurses' bedside notes reveal the following entry on Tuesday at 11:30 A.M.: "Rt. arm seems very swollen, cast appears tight, fingers cold." Dr. Riley saw the child that day at 7:00 A.M. and again at 3:00 P.M., at which time he propped the cast apart with wooden sticks. The pain continued, blisters appeared on the arm and the discoloration of the fingers grew more pronounced through Tuesday and Wednesday. On Wednesday evening Dr. Riley arranged for the child's admission into St. Marks Hospital in Salt Lake City, and she was admitted there on Thursday morning, September 29, at 2:30 A.M. Upon her arrival at St. Marks Hospital, Dr. Pemberton examined her and his findings and opinion as shown in the consultation record are: "Severe vascular impairment of right forearm from elbow down to fingertips with paralysis, anesthesia and cyanosis, probably of 3 days duration. There is evidence of some further process up to the shoulder with swelling and pain." Hospital records dated the same date and signed by Dr. Greene recite: "Imp:

Severe swelling due to casting following comp. fx. of wrist—at present this isn't a Volkmann's." On that same date both Dr. Chambers and Dr. Pemberton stated in the hospital records that the prognosis was very poor for survival of the right hand. Eventually the child's right forearm at the junction of the proximal and middle thirds of the forearm was amputated.

Dr. Robert Major, a practicing physician in San Francisco, was called as an expert witness on behalf of appellees and was allowed to testify, over appellants' objections, that in his opinion: It would generally be considered poor practice to put a circular cast on a fractured arm if there was serious concern about the circulatory condition of the forearm at the time it was set; it was "classic practice" to split a circular cast that was put on immediately after an injury; the better practice would be to use anterior and posterior splints; the amputation of the child's forearm was necessitated by the application of too tight a cast; and the cast should have been removed on Monday, September 26. His testimony was: "I think it would have been preventable on several occasions. If anterior and posterior plaster splints had been used to immobilize the fracture, I think it would not have occurred. I think if the cast had been split—and this is pure opinion—about 12:30 or 1:00 on Monday morning, that it probably would not have occurred." "Split and opened widely." He further testified in substance that it is very unusual to have vascular spasm in a child as a result of a fracture. The doctor also testified: "The cause of the swelling in the arm and shoulder and on to the chest was obstruction in the blood vessels of the arm, which begin at the area of the forearm, and the cause or the fact that the clot stopped the flow of blood, the clot gradually built its way up the veins of the arm into the shoulder until there was no drainage from the veins all the way up to the shoulder, and the blood which could not return to the heart from the area of the obstruction wept fluid

into the tissues causing the swelling, because the veins going to that area were obstructed—I mean coming from that area were obstructed and could not carry that out." The expert medical testimony also clearly shows the most common cause of gangrene after treatment of a fracture is that the cast is too tight and pain is an important indication of a cast being too tight.

The first point upon which appellants rely to secure a reversal of the judgment relates to the sufficiency of the evidence. The appellants contend that the lower court erred in admitting the expert medical testimony of Dr. Major, over their objection, because he did not possess the necessary and required qualifications to make him an expert witness inasmuch as he was not familiar with the standard of medical care prevailing in the community of Kanab, Utah. They assert that when the testimony of Dr. Major is disregarded, as it must be, there is insufficient evidence to support the verdict and judgment.

■■■ It is, of course, the rule that " * * * [p]roof of malpractice, in effect, requires two evidentiary steps: evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff. * * * " [1] Under the law of the State of Utah, a physician or surgeon is not an insurer of a successful result and therefore no presumption of negligence is to be indulged from the fact of an adverse result of his treatment or operation.[2] In order to recover in a malpractice case in Utah, the plaintiff must show that in treating him the doctor did not exercise such care and diligence as is ordinarily exercised by skilled physicians or surgeons doing the same type of work in the vicinity, and that the want or failure of care was the proximate cause of the alleged injury.[3] The first requirement or step, i. e., the standard of ordinary care and skill required of a doctor in the community in which he serves, must necessarily be established by expert medical testimony.[4] And, in the absence of the establishment of such a standard by expert medical testimony and some evidence showing a deviation from this standard, the plaintiff has not made out a case to be submitted to the jury.[5]

■■■ In view of the Utah law, we must determine from the record whether the trial court erred in holding that Dr. Major possessed the necessary qualifications of an expert medical witness. In making such a determination, we are guided by the universal rule that a trial judge has broad discretion in determining whether a particular witness possesses the necessary qualifications and is competent to testify as an expert on the point at issue in the case. The trial judge's determination of that question is ordinarily conclusive and should not be disturbed except in extreme cases where he has clearly erred or where it is manifest that there has been an abuse of discretion.[6] Our function is to deter-

1. Davis v. Virginian Railway Company, 361 U.S. 354, 357, 80 S.Ct. 387, 389, 4 L.Ed.2d 366.

2. Marsh v. Pemberton, 10 Utah 2d 40, 347 P.2d 1108.

3. Marsh v. Pemberton, supra; Edwards v. Clark, 96 Utah 121, 83 P.2d 1021; Baker v. Wycoff, 95 Utah 199, 79 P.2d 77; Baxter v. Snow, 78 Utah 217, 2 P.2d 257.

4. Marsh v. Pemberton, supra; Anderson v. Nixon, 104 Utah 262, 139 P.2d 216; Baxter v. Snow, supra.

5. Marsh v. Pemberton, supra; Fredrickson v. Maw, 119 Utah 385, 227 P.2d 772.

6. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313; Atchison, Topeka and Santa Fe Railway Co. v. Jackson, 10 Cir., 235 F.2d 390; Bratt v. Western Air Lines, 10 Cir., 155 F.2d 850, 166 A.L.R. 1061, cert. denied, 329 U.S. 735, 67 S.Ct. 100, 91 L.Ed. 635; Weber Basin Water Conservancy District v. Nelson, 11 Utah 2d 253, 358 P.2d 81; Webb v. Olin Mathieson Chemical Corporation, 9 Utah 2d 275, 342 P.2d 1094, 80 A.L.R.2d 476; Startin v. Madsen, 120 Utah 631, 237 P.2d 834; Graham v. Ogden Union Ry. & Depot Co., 79 Utah 1, 6 P.2d 465.

mine whether, in the exercise of his discretion, the trial judge applied the correct legal standards.[7]

The record in this case discloses that Dr. Major, a graduate of Baylor University School of Medicine, has been engaged in the general practice of medicine in San Francisco for the past 6½ years and, prior to that time, practiced with his two brothers in a small Texas town where they also operated a 20-bed hospital. During World War II he served in the United States and in Europe with the United States Army, and while a member of an orthopedic surgical team in the European Theatre, did extensive casting of fractures. Dr. Major had set and casted between 120 and 150 fractures similar to the ones in question and, through his experience, reading, lectures and travels was familiar with the practice in small towns throughout the United States with regard to the treatment of such fractures. The appellant, Dr. Riley, was called by appellees as an adverse witness and he testified that in treating the child in this case he employed the practice he had learned at the University of Buffalo and later, during his internship, in Niagara Falls. He further testified that the standard of general practice in Kanab and Salt Lake City is comparable and that the standard of practice for a general practitioner is approximately the same in Salt Lake City and San Francisco. In addition, the record clearly shows that the treatment of fractures is universally the same throughout the medical community.

■■ In our opinion, the foregoing is clearly sufficient to qualify Dr. Major as an expert witness in this case and the lower court correctly permitted him to testify. Certainly, it cannot be concluded on this record that the lower court abused its discretion in that respect. And, when the testimony of Dr. Major is considered together with all of the other evidence, we think there is sufficient evidence to establish both the standard of care required of the appellants and their negligent departure from such standard in their treatment of the child.

■ Appellants' second major point is an attack upon the instructions given by the court and the failure to give certain requested instructions. Appellants' primary complaint is that the court erroneously instructed the jury on the type of proof needed to establish negligence or malpractice [8] and failed to give its requested instruction thereon.[9] They also attack the instructions given by the court on negligence and ordinary care,[10]

7. Bratt v. Western Air Lines, supra, 155 F.2d at 853.

8. " * * * In a malpractice suit against physicians and surgeons, as in all civil actions in this country, negligence on the part of the physicians and surgeons may be proved by circumstantial evidence, and such circumstantial evidence, if any, need not rise to that degree of certainty which would exclude every reasonable conclusion other than the one which you may believe. * * * "

9. "The jury are not permitted to set arbitrarily a standard of their own in determining whether the defendants were negligent or not negligent in this case, or whether or not the treatment of the defendants or lack of treatment caused the plaintiff's injury and damage; that these issues could only be determined through the expert testimony of the physicians who testified on both sides of the case."

10. "Negligence, ladies and gentlemen of the jury, is the doing of some act which a reasonably prudent person would not do, or the failure to do some act which a reasonably prudent person would do, motivated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary and reasonable care and prudence in the management of one's property or person. Negligence is not an absolute term, but a relative one. By this the court means that, in deciding whether there was negligence in a given case, the conduct in question must be considered in the light of all the circumstances shown by the evidence.

"Ordinary care, ladies and gentlemen, is that care which persons of ordinary prudence exercise in the management of their own affairs in order to avoid injuries to themselves or to others. Inasmuch as the amount of caution used by the ordinarily prudent person varies in proportion to

which are claimed to have unduly confused the jury. It may be conceded that the instructions referred to are subject to some question when considered separately and apart from the remainder of the charge. But in reviewing the instructions given to a jury, we must consider them as a whole and not piecemeal or by taking excerpts from the remainder thereof.[11] When the instructions here are so considered, we think they gave the jury a correct understanding of the questions which it was to decide and the pertinent principles of law to guide it in that decision, which is all that is required.[12]

█ It is clear from the complaint, the pre-trial order and the other proceedings, including the nature of the proof presented at the trial, that the gist of the complaint in this case was the negligent failure of the appellants to conform their treatment of the child to the standard of medical care prevailing in the community they served or any similar community. Thus, the instructions on negligence and ordinary care were proper when considered within the charge as a whole. As to the instruction on the type of proof needed to establish negligence or malpractice, it may be by expert testimony but it need not be by such testimony. Appellants overlook the clear distinction between establishing the standard of medical care which, as we have seen, does require expert testimony but establishing that the doctors departed from such standard, does not necessarily require expert testimony. In connection with appellants' claim here that the instructions, as given, confused the jury, it should be noted that after the jurors retired to deliberate they requested of the court " * * * the official wording of the complaint and also your defini-

tion once more, or your instruction once more, regarding neglect." The judge properly discussed this request with counsel in his chambers. During this discussion the court asked counsel: "What do you want to say about it, anything new?" Counsel for the defendants there, and for the appellants here, replied: "I don't know, your Honor, I sometimes wonder if saying any more about the matter wouldn't just confuse them more, if they are confused. I don't know whether they are." Apparently at that time he had little concern about the jury being confused by the instructions. In any event, he made no effort to remove any suggested confusion. While some of the instructions given may not have been necessary in the case, when we look at them, as a whole, we believe the case was fairly submitted to the jury and the appellants were not prejudiced by any of them.

█ Appellants' next contention is that the trial court erroneously allowed counsel for appellees to read from the deposition of the appellant, Dr. Sanella, in cross-examining the appellant, Dr. Riley. Their argument appears to be that the deposition could have been received in evidence but was not and since it was not it was prejudicial error to allow the deposition to be used to impeach Dr. Riley. Appellees, on the other hand, point out Dr. Sanella's testimony in the deposition that he observed a blueness in the child's right hand at about 12:30 A. M., Tuesday, September 27, and argue that the deposition was used, not to impeach Dr. Riley, but to test his knowledge of the existence of this symptom of impairment of blood circulation in the arm that was later amputated. They point out that Dr. Sanella later testified to that effect and assert the use of the

the danger known to be involved in his undertaking, it follows that in the exercise of ordinary care the amount of caution required will vary in accordance with the nature of the act and the surrounding circumstances."

11. Employers Liability Assurance Corp. v. Freeman, 10 Cir., 229 F.2d 547; Kortz

v. Guardian Life Ins. Co., 10 Cir., 144 F.2d 676, cert. denied, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584; Dyess v. W. W. Clyde & Co., 10 Cir., 132 F.2d 972; Cobb v. Union Railway Company, 6 Cir., 318 F.2d 33; Franks v. United States Lines Company, 2 Cir., 324 F.2d 126.

12. Cobb v. Union Railway Company, supra.

·deposition can therefore not be preju-·dicial. Be that as it may, the deposition was that of a party to the action and un-·der the express terms of Rule 26(d) (2), F.R.Civ.P., 28 U.S.C.A., the deposition ·of a party " * * * may be used by an adverse party for any purpose." We find no error on this point.

Other contentions raised by the appel-lants have not been disregarded but have been carefully considered and rejected .as being without merit. In addition, we have carefully read and considered the ·entire record before us and must con-clude that both sides received a fair trial .and that there is ample evidence to sup-port the jury verdict.

The judgment is affirmed.