549 P.2d 1099 (1976)
Jnell M. HAMILTON, Plaintiff-Appellant,
v.
F. Wayne HARDY, M.D., and G. D. Searle & Co., Defendants-Appellees.
No. 74-109.
Colorado Court of Appeals, Div. I.
February 26, 1976.
As Modified on Denial of Rehearing March 18, 1976.
Certiorari Denied May 3 and May 24, 1976.
*1101 Michaud, Cranmer, Syrios, Post & Levy, J. Harold Williams, Wichita, Kan., Elliott & Greengard, James E. Elliott, Jr., Denver, for plaintiff-appellant.
Yegge, Hall & Evans, Richard D. Hall, Denver, for defendant-appellee F. Wayne Hardy, M.D.
Tilly & Graves, James L. Tilly, Denver, Sidley & Austin, William P. Richmond, Chicago, Ill., for defendant-appellee G. D. Searle & Co.
Selected for Official Publication.
*1102 BERMAN, Judge.
This is a malpractice and products liability case. Plaintiff, Jnell M. Hamilton, alleged in her amended complaint that in April of 1967, defendant F. Wayne Hardy, M.D., prescribed for her the "pill" Ovulen as an oral contraceptive; that thereafter she began to experience increasing headaches, migraine in nature, that she again visited Dr. Hardy who, despite being advised of her complaints, assured her she should continue the use of Ovulen, that on or about March 23, 1968, she suffered a stroke, and that the stroke was proximately caused by Dr. Hardy's negligent administration of the medication Ovulen.
Plaintiff further alleged that the stroke was also proximately caused by defendant G. D. Searle & Company's (Searle) negligent research, testing, and manufacturing of the drug Ovulen, by Searle's negligent and careless failure to give adequate warning of the dangerous, unsafe and harmful condition and propensities of the medication. She also alleged breach of express and implied warranties by Searle, that the drug Ovulen was defective and unreasonably dangerous, and intentional misrepresentation by Searle.
After plaintiff rested her case, the court granted Dr. Hardy's motion for dismissal. The court also granted Searle's motion for dismissal against plaintiff on her theories of breach of implied and express warranty, negligent testing, and intentional misrepresentation.
At the conclusion of Searle's defense, the court denied Searle's motion for a directed verdict, but refused to instruct the jury on the theory of strict liability. The case was submitted to a jury, which, in a general verdict, found the issues joined in favor of Searle. This appeal followed.
Plaintiff contends that the court erred in granting Dr. Hardy's motion for dismissal. She further contends that the court erred in admitting one of Searle's exhibits into evidence and in permitting cross-examination of plaintiff's witness with information contained in that exhibit, and that the court erred in refusing to give her tendered instructions on strict liability and negligent testing. She has not appealed the court's dismissal of her theories of breach of implied and express warranty, negligent testing, and intentional misrepresentation.

DISMISSAL OF CLAIMS AGAINST DR HARDY
Plaintiff contends the trial court erred in granting the motion to dismiss made by defendant Hardy at the close of plaintiff's evidence. She argues that there was sufficient evidence to submit to the jury the following three issues of malpractice by Dr. Hardy: (1) Whether Dr. Hardy possessed that reasonable degree of learning and skill which is ordinarily possessed by others of the medical profession in the Denver area with respect to birth control pill risks; (2) whether Dr. Hardy was negligent in not terminating the plaintiff's prescription for Ovulen upon learning that her headaches had become more severe and frequent while taking the pill; and (3) whether there was an informed consent given by plaintiff at the time Dr. Hardy prescribed Ovulen.
(1) Inadequate Knowledge of the Risks Related to Birth Control Pills
Plaintiff claims that Dr. Hardy's alleged lack of expertise concerning the risks associated with oral contraceptives should have been submitted to the jury, but she concedes that "there was no expert evidence as to the deficiencies of Dr. Hardy's knowledge." That absence of expert testimony justified the trial court's dismissal of this claim.
The law implies that a physician "possesses that reasonable degree of learning and skill which is ordinarily possessed by others of the profession . . . ." Artist v. Butterweck, 162 Colo. 365, 426 P.2d 559. Whether Dr. Hardy possessed a reasonable degree of learning in 1967 with respect to the risks associated with oral *1103 contraceptives is not a matter so simple that laymen are equally as able as experts to pass on it; hence, expert testimony was necessary to sustain this claim. Daly v. Lininger, 87 Colo. 401, 288 P. 633. "If no standard is established by the testimony of physicians, there is no standard for the determination of the ultimate question of the physician's negligence." Smith v. Curran, 28 Colo.App. 358, 472 P.2d 769.

(2) Failure to Terminate Plaintiff's Prescription

Plaintiff next contends that there was sufficient evidence to submit to the jury the issue of whether Dr. Hardy was negligent in not terminating the plaintiff's prescription for Ovulen upon learning that her headaches had become more severe and frequent while taking the oral contraceptive Ovulen. We agree.
Plaintiff testified that on her second visit to Dr. Hardy in July of 1967 she told him that her headaches had increased in severity and frequency since she began taking Ovulen, pursuant to his prescription the previous April, and that she asked Dr. Hardy if Ovulen was the cause of her headaches and "he emphatically said they were not." For the purpose of this review, we assume the truth of this testimony. Bald Eagle Mining & Refining Co. v. Brunton, 165 Colo. 28, 437 P.2d 59; Newhouser v. Sancetta, 157 Colo. 353, 402 P. 2d 613.
The issue thus becomes whether Dr. Hardy's conduct in not terminating plaintiff's use of the contraceptive was within the standard of care in the community in which he practiced. Although numerous doctors testified, the only evidence on the standard of care relevant to this issue came from Dr. Hardy (called as an adverse witness on behalf of plaintiff), and Kenneth R. Gottesfeld, M.D., a Denver obstetrician and gynecologist like Dr. Hardy. Dr. Hardy testified that upon being confronted with a patient with plaintiff's history and complaints, he would "probably" terminate the drug and refer her to a neurologist. And, both doctors agreed that such procedure would be "good medical practice;" however, on whether failure to terminate the drug fell below the applicable community standards, the testimony was inconclusive, there being both testimony that the "average" gynecologist would have stopped the use of the drug and also testimony that "some" well-qualified physicians would have continued it.
In dismissing the claim against Dr. Hardy, the trial court ruled that the subjective standard of Dr. Hardy and the average practitioner in his specialty would call for the termination of the drug, but ruled that there was no evidence that Dr. Hardy violated an objective standard of care applicable to the situation presented.
The objective standard is the proper test. Artist v. Butterweck, supra; Klimkiewicz v. Karnick, 150 Colo. 267, 372 P.2d 736; Foose v. Haymond, 135 Colo. 275, 310 P.2d 722. Nor is Osborne v. Frazor, 58 Tenn.App. 15, 425 S.W.2d 768, cited by plaintiff, to the contrary. That decision merely supports the general rule that the objective standard of care may be established by the defendant-doctor's own testimony, it does not support a subjective standard of care test.
Nevertheless, viewing the pertinent expert testimony in the light most favorable to plaintiff, Bald Eagle Mining & Refining Co., supra, we find it sufficient to establish an objective standard of care by which the jury could judge Dr. Hardy's actions.
Dr. Gottesfeld testified that, under the history and symptoms presented by plaintiff, the "average obstetrician-gynecologist standard" at that time would have been to remove plaintiff from the drug and seek neurological consultation. Dr. Hardy confirmed that this course of action would have been within the acceptable standard of care applicable and testified that he would "probably" follow that procedure.
This testimony, viewed in the light most favorable to plaintiff, was sufficient *1104 to allow the jury to decide this issue, and the testimony that "some" well-qualified physicians would not discontinue the drug would not remove the issue from the purview of the jury. Although "some" well-qualified board-certified obstetricians and gynecologists might have continued plaintiff on the pill in July 1967, we do not find "some" rises to the dignity of a respectable minority. Neither Dr. Hardy nor Dr. Gottesfeld said they approved of continuing the drug and neither testified that, in their opinion, this course of action was within the standard of practice in Denver in 1967. Only when it is shown that a respectable minority of physicians approved of the course of action selected should the case be taken from the jury. Olson v. Weitz, 37 Wash.2d 70, 221 P.2d 537.
Nor does the testimony of Dr. Gottesfeld that those doctors who continued the prescription would not have been guilty of malpractice "in regards to warnings issued by the company," alter our conclusion. A manufacturer's warnings do not set an absolute standard of care. Crouch v. Most, 78 N.Mex. 406, 432 P.2d 250. The standard by which a physician's conduct is judged is an objective community standard. Reliance solely on the manufacturer's warnings may or may not have been within the standard of medical practice in Denver at that time; there was no testimony on this subject. Accordingly, the issue should have been left for the jury to resolve under all the testimony presented.

(3) Informed Consent

As a final argument against the dismissal of her claim against Dr. Hardy, plaintiff asserts that her consent to take Ovulen was not an informed consent because Dr. Hardy did not inform her of the possibility that she might suffer abnormal blood clotting, and that the issues relative thereto should have been submitted to the jury. We agree.
In support of this basis for recovery, plaintiff testified that she took two different types of birth control pills beginning in 1965, and that when she moved to Denver in 1967, she went to Dr. Hardy to see if she should continue taking oral contraceptives. She testified Dr. Hardy saw no reason why she should stop taking birth control pills, and he switched her prescription to Ovulen. She testified that Dr. Hardy did not tell her of any adverse effects on either occasion, nor did he give her any booklets or literature.
Dr. Hardy's testimony demonstrated that, in 1967, he was aware of a possible relationship between utilization of oral contraceptives and thromboembolism, i. e., blood clotting, and he admitted that he did not know whether he had warned plaintiff about this possible side effect, or any side effect. Nevertheless, he urges that the existence and scope of a doctor's duty of disclosure must be established by expert testimony, and since no such evidence was offered, he contends that dismissal of the informed consent claim was proper. We disagree.
The trend in recent years has been to reject the need for expert testimony on the existence and scope of a doctor's duty to warn of material risks inherent in a surgical technique or prescription drug. See, e. g., Canterbury v. Spence, 150 U.S.App.D.C. 263, 464 F.2d 772; Cobbs v. Grant, 8 Cal. 3d 229, 104 Cal.Rptr. 505, 502 P.2d 1; Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676; Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297.[1] In Colorado, where a plaintiff's evidence shows that she was uninformed due to a failure of disclosure, "the physician must go forward with evidence establishing that his failure to disclose conformed with community medical standards . . . ." Stauffer v. Karabin, 30 Colo.App. 357, 492 P.2d 862; Mallett v. Pirkey, 171 Colo. 271, 466 P.2d 466. Implicit in Mallett and Stauffer is the premise *1105 that the duty to disclose is a duty imposed by law, and does not owe its existence to community medical standards.
Viewing the evidence in the light most favorable to plaintiff, she established by her own testimony and Dr. Hardy's that she was not informed by Dr. Hardy of the possible side effects associated with the pill or of the risk of abnormal blood clotting. Dr. Hardy's testimony reveals he was aware of this possible risk, since he sometimes discussed it with his patients. Furthermore, Dr. Gottesfeld testified he warned his patients about possible risks and side effects. (Although these risks were not specified, the fact remains that this doctor made some disclosure.) Thus, plaintiff established a prima facie case and it became incumbent upon Dr. Hardy to introduce evidence of the extent to which nondisclosure complied with community standards. Stauffer v. Karabin, supra. Accordingly, the dismissal was error.
Although plaintiff did not testify that she would not have taken the oral contraceptive had she been advised of this risk, such testimony would be, at best, self-serving, speculative, and, of course, subjective. That omission does not defeat her claim. Her right to recover must be resolved on an objective basis, i. e., what would a reasonable person in the plaintiff's position have decided if adequately informed? Cobbs, supra; Canterbury, supra.

APPEAL ISSUES REGARDING DEFENDANT SEARLE

(1) Deposition from California Action Plaintiff contends the court erred in admitting one of Searle's exhibits into evidence and in permitting cross-examination of plaintiff's witness with information contained in that exhibit. We agree.
According to the testimony of one of plaintiff's expert witnesses, his opinion on the causal relationship between oral contraceptive medication and clotting disorders was premised in part on the report of a research study conducted by one Nelson S. Irey, M.D.
Dr. Irey [2] had supplied answers to interrogatories relative to his article in a civil action in California, and upon cross-examination of plaintiff's expert, counsel sought to use those answers and an attached exhibit for the purpose of "attacking the credibility of [Dr. Irey's] article." The trial court allowed parts of the material to be read and allowed it to be introduced into evidence. This was error.
We have found no case, and defendant has cited none, which permits the use of a deposition under these circumstances. Plaintiff was not present or represented at the taking of the Irey answers, nor did she have notice thereof. The California action does not involve either of the parties, nor their representatives or successors in interest. There is no evidence as to what the issues were in the California action. Hence, in regard to the Irey materials, the criteria for admissibility set out in C.R.C. P. 32(a) were not met and their use should not have been allowed.
Searle, however, asserts its only purpose in using Dr. Irey's answers was to identify that an exhibit attached thereto contained the case histories of the women who were the subjects of Dr. Irey's article. Hence, it concludes that plaintiff had no need to cross-examine Dr. Irey, and that therefore the trial court ruling was correct. However, that conclusion is speculative in nature and represents insufficient justification for discarding an applicable rule. Furthermore, defendant Searle may not decide for plaintiff when, how, and to what extent cross-examination will be permitted.
C.R.C.P. 43(a) and 44(a)(1), relied on by Searle, are inapplicable. C.R.C.P. 43(a) applies "[e]xcept as otherwise expressly provided in these Rules . . .;" hence, C.R.C.P. 32(a) governs the material in question.
*1106 Finally, Searle contends this error was harmless and does not justify a new trial. We disagree.
The deposition and its use were not "merely cumulative to the evidence already before the court." Sentinel Petroleum Corp. v. Bernat, 29 Colo.App. 109, 478 P.2d 688.
It is an understatement to say that the issue of whether Ovulen causes thrombosis was hotly contested. See Paul, The PillA Legal and Social Dilemma, 45 Temple L.Q. 484 (1972). Thus, the improper use of the deposition could have substantially prejudiced plaintiff's case. Ross v. Colorado National Bank, 170 Colo. 436, 463 P.2d 882.

(2) Failure to Instruct on Strict Liability

Reversal is also required because the trial court erred in refusing to instruct the jury on plaintiff's theory of strict liability. She claims that Searle's failure to warn[3] of dangers, hazards, adverse reactions, and side effects which may result from Ovulen renders the product[4] unreasonably dangerous and provides a basis for the imposition of strict liability pursuant to Restatement (Second) Torts § 402A. We agree.
The trial court apparently perceived no difference between a negligence claim based on a failure to warn and a strict liability claim based on a failure to warn, and felt instructing on both theories would be duplicitous and confuse the jury.
Some jurisdictions have held that when the allegation is a failure to warn adequately, there is no difference between the theories of strict liability and negligence. Basko, supra; Sterling Drug, Inc. v. Yarrow, 408 F.2d 978 (8th Cir.); Skaggs v. Clairol Inc., 6 Cal.App.3d 1, 85 Cal.Rptr. 584; and see Annot., 53 A.L.R.3d 239. In fact, some courts have found error where the jury is instructed on both theories. See, e. g., Skaggs, supra. The reasoning given by these courts is that the manufacturer can be found strictly liable under § 402A only if it negligently failed to warn of the dangerous propensities of its drug, using the test for duty to warn found in Restatement (Second) Torts § 388 as being applicable to both strict liability and negligence in the failure to warn context. Sterling Drug, Inc. v. Yarrow, supra; Skaggs, supra.
Although we agree the evidence which proves a failure to warn is the same under both theories, we disagree that the theories are identical. See generally 2 Harper & James, Torts § 28.22 (1968 Supp.). As the jury was instructed here, in negligence, reasonable care is "that degree of care which a reasonably prudent drug manufacturer would use under the same or similar circumstances," and negligence means "a failure to do an act which a reasonably prudent drug manufacturer would do, or the doing of an act which a reasonably prudent drug manufacturer would not do, under the same or similar circumstances." The jury was then instructed that for plaintiff to prevail they must find that "the Defendant was negligent in marketing of Ovulen by failing to use reasonable care to warn the medical profession on the question of whether Ovulen causes thrombosis."
In strict liability, on the other hand, a manufacturer who sells a product in a defective condition unreasonably dangerous to the consumer is subject to liability for physical harm thereby caused, even though the seller has exercised all possible care in *1107 the preparation and sale of the product. Bradford v. Bendix-Westinghouse Automotive Air Brake Co., 33 Colo.App. 99, 517 P.2d 406; Restatement (Second) Torts § 402A. And, as plaintiff's tendered instruction stated:
"A product may be in a defective condition unreasonably dangerous to the user without any ascertainable defect or impurity in the product and although the product was precisely what it was intended to be if the manufacturer fails to give adequate and timely warnings as to dangers or hazards which may result from such product. To prevent a product from being unreasonably dangerous, appropriate and timely warnings concerning adverse reactions must be given."
This instruction makes the distinction between the two theories apparent. Under strict liability, the test is whether the failure of Searle to adequately warn of the potentially dangerous propensities of its product rendered that product unreasonably dangerous. It is of no import whether this drug manufacturer's warning comported with the warning a reasonably prudent drug manufacturer would have given. "[S]trict tort liability shifts the focus from the conduct of the manufacturer to the nature of the product." 2 L. Frumer & M. Friedman, Products Liability § 16A[4][e] (1975); Hiigel v. General Motors, Colo., 544 P.2d 983 (1975); Bradford, supra.
The distinction between negligence and strict liability based on failure to warn is well stated in Phillips v. Kimwood Machine Co., 269 Or. 485, 525 P.2d 1033:
"In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's action in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it."
See also Wade, Strict Tort Liability of Manufacturers, 19 S.W.L.J. 5 (1965). Hence, since plaintiff sought recovery under a strict liability theory as well as a negligence theory, she would be entitled to jury instructions on that theory if the evidence would support a verdict for her on that theory.
In general, for there to be recovery under Restatement (Second) Torts § 402A, a plaintiff must demonstrate that the defective condition of a product makes the product unreasonably dangerous. In the case of prescription drugs, such as Ovulen, which may be "unavoidably unsafe" as that term is used in comment k of Section 402A, the requirements of "defective condition" and "unreasonably dangerous" have a different meaning than in the usual 402A sense. Such a drug is made in the way it was intended, contains no impurities, and is in the condition planned, but it proves to be dangerous because it is "incapable of being made safe for [its intended and ordinary use]." Restatement (Second) Torts § 402A, comment k. As to such products, if the product is accompanied by adequate warning, it is not defective and is not unreasonably dangerous.[5] However, when not accompanied by an adequate warning, the product is defective, *1108 see Hiigel, supra; 2 L. Frumer & M. Friedman, supra, and thus may be unreasonably dangerous.[6]Sterling Drug, Inc. v. Yarrow, supra; Wade, supra; 2 Harper & James, Torts § 28.8 (1968 Supp.). The defect is not the dangerous propensities or side effects of the drug, but the failure to warn. See Reyes, supra, n. 5; Hiigel, supra; 2 L. Frumer & M. Friedman, supra; but see Comment, Liability of Birth Control Pill Manufacturers, 23 Hastings L.J. 1526 (1972) ("The harmful side effect inherent in the drug is the defect.") Thus the question to be posed to the jury with regard to the strict liability issue is whether the manufacturer's failure to adequately warn rendered the product unreasonably dangerous without regard to the reasonableness of the failure to warn judged by negligence standards. On remand, the jury should be so instructed.
Defendant Searle contends that there was no evidence that the failure to warn, if any, rendered Ovulen "unreasonably dangerous," and therefore the trial court correctly refused the tendered instruction. This contention is without merit.
Whether the evidence submitted would warrant a finding for plaintiff on this issue is a question that must be analyzed in light of the following test:
"A way to determine the dangerousness of the article, as distinguished from the seller's culpability, is to assume the seller knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, he would have been [acting unreasonably] in selling it without a warning."
Phillips v. Kimwood Machine Co., supra.[7] See also Reyes, supra; Wade, supra.
Although some of the doctors testified that, in their opinion, Ovulen was not "unreasonably dangerous," their opinions were not couched in the terms of the above test. Dr. Gottesfeld, however, testified that, in 1967-68, he did not consider Ovulen unreasonably dangerous based on "what was known at that time" and "with certain additional warnings to my patients." This testimony would permit the inference that the product was unreasonably dangerous under the above test; thus, there was sufficient evidence on this issue to justify an instruction.
In this connection, we would also point out that, under a strict liability theory, a manufacturer must warn of dangers and risks, whether or not a causal relationship between use of the product and the various injuries has been definitively established at the time of the warning. See McCue v. Norwich Pharmacal Co., 453 F. 2d 1033 (1st Cir.); Basko, supra; Leibowitz v. Ortho Pharmaceutical Corp., 224 Pa. Super. 418, 307 A.2d 449; Stevens v. Parke, Davis & Co., 9 Cal.3d 51, 107 Cal. Rptr. 45, 507 P.2d 653.
Plaintiff presented evidence concerning case reports submitted to Searle at its request by doctors from around the country. This evidence showed that Searle first received a report relating to the occurrence of thrombotic diseases coincidental with the taking of its contraceptives in 1957 or *1109 1958; that Searle had received a report in late 1961 or early 1962 of the occurrence of a cerebral thrombosis in a woman taking Searle's oral contraceptive; that by December of 1962, Searle already had 272 case reports concerning thrombotic diseases occurring in women taking its oral contraceptives; and that, by March of 1968, several hundred physicians had reported the occurrence of thrombotic diseases in women taking Searle's oral contraceptives, many of which were cerebrovascular accidents. Plaintiff also introduced evidence that, by January 1965, Searle had notice from the published medical literature that there had been cases of cerebrovascular accidents reported in women in conjunction with the use of oral contraceptives. "[A] drug manufacturer may not escape liability by merely ignoring existing reports of side-effects or dangers in the use of its product." Leibowitz, supra.
While plaintiff must prove causation, i. e., the cause and effect relationship between the dangerous propensity of the drug and her injury, as part of her case under either theory, the adequacy of the warning, which the parties agreed was to be measured by what was known or should have been known at the time of the warning, does not depend on knowledge of a definitive cause and effect relationship.[8]
Searle also argues that plaintiff failed to prove that the inadequate warning, if any, was the cause of plaintiff's injuries. Searle contends that Dr. Hardy's testimony that he would have taken plaintiff off the drug had he known of her continuing headaches breaks any causal link between the manufacturer's inadequate warning and plaintiff's injury. Assuming that Dr. Hardy would have acted as his testimony indicated, we do not agree that Searle is relieved of liability. In essence, Searle claims that Dr. Hardy's conduct constituted an intervening cause which exonerates it from liability for its failure to warn.
Under different factual settings, this intervening cause argument has been rejected. McCue v. Norwich Pharmacal Co., surpa; Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir.); Sterling Drug, Inc. v. Yarrow, supra. See also Singer v. Sterling Drug, Inc., 461 F.2d 288 (7th Cir.); Ethicon, Inc. v. Parten, 520 S.W.2d 527 (Tex.Civ.App.); Reyes, supra. As the court in McCue stated:
"Even if a physician's carelessness may have taken a form not specifically anticipated, defendant should not escape liability so long as its failure to give an adequate warning may have contributed thereto.
[H]aving put a dangerous drug on the market without adequate warning defendant cannot be heard to say that the physician might have disregarded a proper one."
Consequently, we hold that where an ethical (i. e., prescription) drug manufacturer puts a drug on the market without adequate warning, the prescribing doctor's conduct may not insulate the manufacturer from liability where the inadequacy of the warning may have contributed to plaintiff's injury. What the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case.
Furthermore, here, there was evidence from which the jury could have found that although the doctor was cognizant of the dangers involved, Searle's inadequate warning and its promotion of Ovulen contributed to Dr. Hardy's continued prescription, and, "if it was reasonably foreseeable that physicians, despite awareness of the dangers of [the drug], would be consciously or subconsciously induced to prescribe the drug when it was not warranted, [the manufacturer] cannot be relieved of liability because of the intervening act of [the *1110 doctor] in prescribing the drug while cognizant of its dangers." Stevens v. Parke, Davis & Co., supra.
Dr. Hardy testified he would have heeded any additional warnings the drug manufacturer would have included. A detail man[9] for Searle testified that he never told any doctor that he called upon anything other than what was set forth in the package inserts of the company, that he attempted to present the positive aspects of the drugs he was detailing to the doctors, that he received instructions from Searle not to mention adverse reactions and undesirable side effects of Searle's oral contraceptive unless the physician asked about such items, and that he was instructed not to talk about the negative or adverse reactions as part of his normal presentation.
This evidence would support a finding that Searle's activities were a proximate cause of the injury. See Barker v. Colorado Region-Sports Car Club of America, Inc., 35 Colo.App. 73, 532 P.2d 372.
And, although the drug manufacturer's duty, owed to the public, is the duty to warn the medical profession,[10] it is for the benefit of the patient. "[I]t is not unlikely that a properly warned physician would discuss such risks with the patient." McEwen v. Ortho Pharmaceutical Corp., Or., 528 P.2d 522; see also Paul, The PillA Legal and Social Dilemma, supra. The warning thus achieves two purposes: (1) It will alert the doctor to premonitory symptoms of the side effect, Reyes, supra; Vaughn v. G. D. Searle and Co., supra; and (2) it will enable the patient to evaluate the relative advantages and disadvantages of taking the drug. See McEwen, supra. The same dual purpose rationale prompted the court in Hiigel v. General Motors Corp., supra, to say:
"[T]he duty to warn may not be satisfied by directions which merely tell how to use the product, but say nothing about the inherent and specific dangers if directions are not followed."
Consequently, in summary, we hold that plaintiff's claim premised on strict liability was separate and distinct from her claim premised on negligence. Further, we hold that plaintiff's evidence relative to Searle's failure to warn adequately concerning the dangers of blood clotting was sufficient to entitle her to an appropriate instruction on a strict liability theory of recovery.

(3) Negligent Testing

Plaintiff next contends the court erred in refusing her tendered instruction on negligent testing by Searle. This claim, however, was dismissed by the court at the conclusion of plaintiff's case and this ruling has not been appealed. It is not error to refuse a requested instruction on an issue eliminated during the proceedings. Arkansas Valley Bank v. Esser, 75 Colo. 110, 224 P. 227.
The judgment is reversed and the cause remanded for a new trial as to both defendants in accordance with the views expressed herein.
COYTE and ENOCH, JJ., concur.
NOTES
[1] In the cases cited supra, proof of non-compliance with community standards has been held unnecessary as a portion of plaintiff's case and proof of compliance has been rejected as a complete defense.
[2] Dr. Irey was not a witness, nor was his deposition taken, in this action.
[3] The failure to warn has two aspects: (1) A complete failure to warn, and (2) a failure to adequately warn. Basko v. Sterling Drug, Inc., 416 F.2d 417 (2d Cir.). Here, a warning was given by Searle but plaintiff's claim is that the warning was inadequate.
[4] Plaintiff does not contend that the product contained any foreign substances or impurities, that improper compounding of Searle's product occurred in the process of manufacture, nor does she challenge the efficacy of the product in preventing conception.
[5] Comment k uses the Pasteur rabies treatment as an example of an "unavoidably unsafe product." In that example, the warning serves no purpose other than to cause an awareness of the danger; there is no choice but to take the drug knowing its risks or to suffer the consequences. For Ovulen, the warning would serve an additional purpose, to alert the doctor to premonitory symptoms so the medication could be withdrawn prior to serious injury. Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5th Cir.); see Vaughn v. G. D. Searle & Co., Or., 536 P.2d 1247.
[6] Professor Wade suggests that "defective condition" has "no independent meaning" in these circumstances; "[t]he only real problem is whether the product is `unreasonably dangerous'" when not accompanied by adequate warnings. Wade, supra; see also Basko, supra; Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir.).
[7] We reject the test set forth in Carmichael v. Reitz, 17 Cal.App.3d 958, 95 Cal.Rptr. 381, which requires that plaintiff prove the drug to be "`dangerous to an extent beyond that which would be contemplated by her physician who purchases it, with the ordinary knowledge common to the medical community as to its characteristics.'" This test comes from Section 402A, comment i (superimposed on the rule that the warning is to be given to the doctor), which discusses "unreasonably dangerous" in the context of traditional "defects" (mismanufacture and design defect), and we deem it inappropriate where, as here, the defect is a failure to warn of dangerous propensities of a prescription drug.
[8] We note that the 1967 package insert for Ovulen listed numerous adverse reactions and "occurrences [that] have been observed in users of oral contraceptives; [although] a cause and effect relationship has not been established."
[9] A "detail man" is a specially trained field representative engaged in selling and promoting the use of the manufacturer's product by personal calls on doctors in which oral presentations are made and literature and samples delivered.
[10] Basko, supra; Yarrow, supra; Cornish, supra; Carmichael, supra. The application of this rule to oral contraceptives has been criticized. See Comment, Liability of Birth Control Manufacturers, 23 Hastings L.J. 1526 (1972).