Dennis NIBLACK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 75–F–493.

United States District Court, D. Colorado.

Aug. 24, 1977.

William E. Myrick, Robert O. Newton, Myrick, Newton & Sullivan, P. C., Denver, Colo., for plaintiff.

Cathlin Donnell, Joseph F. Dolan, U. S. Atty., James P. Gatlin, Asst. U. S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge.

This medical malpractice case under the Federal Tort Claims Act, 28 U.S.C. § 1346, concerns the alleged negligent administration of the drug, Decadron, a potent corticosteroid.[1] Defendant conceded at trial that treatment of Plaintiff with Decadron at the Denver Veterans Administration (VA) Hospital in early 1971 resulted in bilateral aseptic necrosis of Plaintiff's femoral heads.[2] Plaintiff claims (1) that treatment with Decadron was negligent, and (2) that he should have been informed of the

---

1. According to *Physician's Desk Reference* (PDR), Decadron is 25 to 30 times as potent as hydrocortisone. Ex. 10. Decadron is a synthetic steroid, which was first sold in the early 1960's by Merck & Co., and is considered to be one of the most important drugs in the field of neurology. On May 26, 1977, we dismissed Merck & Co. from this case, in accordance with a stipulation of the parties.

2. Aseptic necrosis of the femoral heads is a condition wherein the upper part of the thigh bones die, because of loss of blood supplied to those parts.

risk of aseptic necrosis. Defendant argues that (1) the statute of limitations bars Plaintiff's claim, (2) the administration of Decadron was proper, and (3) the admitted failure to warn Plaintiff of the potential adverse side-effect, aseptic necrosis, conformed to the standard of medical care in the Denver area at that time.

## I.

On December 30, 1970, Plaintiff was admitted to the VA Hospital in Denver, Colorado. He was suffering from severe visual impairment, nausea, and headaches. Dr. Ronald Ignelzi, a neurosurgeon, correctly diagnosed Plaintiff's illness as pseudotumor cerebri, a swelling of the brain that mimics brain tumors and jeopardizes vital functions. Dr. Ignelzi immediately commenced treatment of Plaintiff with Decadron. Plaintiff's condition improved rapidly under a course of treatment with Decadron, which was administered in decreasing dosages until its discontinuation on January 2, 1971. On January 11, 1971, Dr. Ignelzi reinstituted treatment with Decadron. Plaintiff was administered two milligrams (mg.) of Decadron three times daily until February 22, 1971, when the dosage was reduced to one mg. three times daily. On March 3, 1971, the administration of Decadron was reduced to one-half mg. three times daily. Finally, Plaintiff's Decadron treatment was discontinued on March 6, 1971. Plaintiff left the Hospital on March 19, 1971.

During the summer of 1971, Plaintiff began experiencing pain in his knees. Plaintiff consulted Dr. Becker in Reno, Nevada, where Plaintiff was employed. Dr. Becker diagnosed Plaintiff's condition as rheumatoid arthritis. In actuality, Plaintiff was experiencing referred pain from the progressive deterioration of his femoral heads. Dr. Becker referred Plaintiff to Dr. Thompson, who diagnosed Plaintiff's condition as a form of bone cancer. On March 15, 1972, Plaintiff consulted Dr. Ignelzi in Denver. Through his own independent research, Plaintiff had begun to suspect that his condition might be aseptic necrosis. He specif-ically asked Dr. Ignelzi whether his condition was the result of the treatment he had received during his stay at the VA Hospital. Dr. Ignelzi responded negatively, but referred Plaintiff to Dr. Murray Gibbens at the Denver VA Hospital.[3] A few days thereafter, Dr. Gibbens diagnosed Plaintiff's condition as aseptic necrosis. On April 29, 1972, Plaintiff had this diagnosis confirmed by Dr. William Thulin, an orthopedist. On June 20, 1972, Dr. Thulin performed a total left hip replacement. On July 31, 1972, Dr. Thulin confirmed, by x-ray, a diagnosis of aseptic necrosis of Plaintiff's right femoral head. On December 18, 1972, Dr. Thulin performed a total right hip replacement.

## II.

The statute of limitation applicable in this tort action provides that the claim must be filed within two years of its accrual. 28 U.S.C. § 2401. Plaintiff filed his claim on November 6, 1974, although it was not received until November 12, 1974. Ex. A. The issue we must decide is when Plaintiff's right of action accrued, thereby commencing the running of the statute of limitation. The general rule is that the statute begins to run when Plaintiff discovers or should have discovered the causal nexus between his injury and the alleged act of malpractice. *Casias v. United States*, 532 F.2d 1339, 1340 (10th Cir. 1976); *Roman v. A. H. Robins Co., Inc.*, 518 F.2d 970 (5th Cir. 1975); *Jordan v. United States*, 503 F.2d 620 (6th Cir. 1974); *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973); *Toal v. United States*, 438 F.2d 222 (2d Cir. 1971); *Brown v. United States*, 353 F.2d 578 (9th Cir. 1968); *Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962).

Under the modern approach expressed in these cases, a claim does not necessarily accrue when Plaintiff realizes the causal connection between the act that is ultimately alleged to be negligent and his injury. Plaintiff, or a reasonable person, must also have been alerted to the possibili-

3. Dr. Gibbens is an orthopedic surgeon.

ty that the physician's act was negligent. This rule has its most extreme statement in *Jordan*, where Plaintiff believed that his blindness "was the inevitable consequence" of a sinus operation. It was not until Plaintiff was told by a doctor that the surgeons had "screwed up your eye when they operated on your nose" that Plaintiff's claim was held to accrue. *Id.* at 621. *Casias, supra*, distinguished *Jordan* on the ground that no credible explanation was given to Casias that could be considered misleading on the issue of whether malpractice occurred. *Casias* at 1341–42.

■ In the instant case, we find that Plaintiff clearly understood the causal connection between the administration of steroid therapy and his aseptic necrosis during the spring of 1972. This was more than two years prior to his filing of the instant claim on November 6, 1974. During the spring of 1972, he wrote two letters in connection with his attempt to obtain service-connected disability benefits, both of which clearly manifest Plaintiff's understanding of the cause of his bone disease. On March 20, 1972, Plaintiff wrote, *inter alia*:

> Also my leg (left) has an advanced case of Aseptic Necrosis as I explained on account of drugs (steroids) given to me in connection with my Brain Tumor which led to my blindness which according to Dr. Ignelzi is related to my ear which occurred while in service. Dr. _____ the attending orthopedist at the VA in Denver has testified about the Steroids and that letter in the form of a treatment record is in my medical folder at VA Hospital Denver. My medical chart proving the issuance of the Steroid is also there.

Ex. B. On May 25, 1972, Plaintiff wrote, *inter alia*:

> I was stricken with a brain tumor in 1970 (December 23), as a result of this condition I was left blind. At that time I was issued the drug Decadron for my eyes which caused the condition in my legs which should be explained later . . .
> This drug my orthopedic surgeon concurs has caused me to develop Aseptic Necrosis. This condition in which the bones in my hip are dissolving can be reasonably corrected with a plastic hip . . .

We further find that Plaintiff discussed the relationship between steroid therapy and aseptic necrosis with Dr. Thulin during the spring and summer of 1972.[4] Moreover, Plaintiff, who holds a post-graduate degree, performed his own library research on the subject of his disease during the spring of 1972.

Negligence is a factual conclusion. After the summer of 1972, Plaintiff obtained no new factual information concerning the causal nexus between the alleged acts of malpractice and his injury. The operation on his right hip in December 1972 disclosed nothing that the prior diagnoses and operation on his left hip did not reveal. Therefore, Plaintiff should have concluded by the summer of 1972 that the alleged act of malpractice was negligent.[5] Moreover, Plaintiff was not misled as to the cause of his disease at any time within two years of his filing of the claim. Accordingly, Plaintiff's claim is barred by the statute of limitation of 28 U.S.C. § 2401.[6]

### III.

[3–5] State law determines the standard of conduct against which the acts of government agents are to be measured in claims under the Federal Tort Claims Act. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Proof of malpractice

---

4. By March 20, 1972, Plaintiff recognized the causal relationship between the aseptic necrosis of his left hip and the Decadron treatment. By July 31, 1972, Plaintiff recognized the causal relationship between the aseptic necrosis of his right hip and the Decadron treatment.

5. In this case, we conclude, *infra*, that no negligence occurred. It is, therefore, meaningless to

insist that Plaintiff's claim did not accrue until he should have realized that negligence occurred. It is sufficient that we have found that Plaintiff was fully informed that the administration of Decadron caused his aseptic necrosis. *See* Plaintiff's Brief at 12.

6. Independent bases warranting judgment for Defendant are covered in sections III and IV.

in Colorado requires evidence of the standard of care in the medical community for the particular type of case at that time, and a showing by a preponderance of the evidence that there was a negligent departure from this standard of treatment. *Riley v. Layton*, 329 F.2d 53 (10th Cir. 1964); *Artist v. Butterweck*, 162 Colo. 365, 426 P.2d 559 (1967); *Hamilton v. Hardy*, 549 P.2d 1099 (Colo.App.1976). We find that there was no negligence on the part of Dr. Ignelzi in his treatment of Plaintiff with Decadron.

The "mainstay" treatment for lowering intracranial pressure due to pseudotumor cerebri is the administration of corticosteroids. Deposition of Donald W. Ryan, M. D. at 12, 26. It is to Dr. Ignelzi's credit that such treatment was initiated on the day of Plaintiff's admission to the Denver VA Hospital. *Id.* at 23. Plaintiff was admitted to the Hospital with sixth nerve palsy, a condition that resulted from intracranial pressure, which caused his loss of vision. If radical and immediate treatment to alleviate this pressure were not taken, permanent loss of vision, loss of consciousness, and sudden death could have occurred. *Id.* at 22–23.

Plaintiff does not dispute the fact that he was properly treated with Decadron upon his admission to the Hospital. However, Plaintiff claims that the resumption of treatment with Decadron on January 11, 1971, several days after his intracranial pressure had returned to normal, violated proper standards of medical care in Denver at that time. We disagree. On January 11 or 12, 1971, Plaintiff was still in danger of further vision loss and of renewed brain swelling, particularly where the pressure had subsided more rapidly than usual. *Id.* at 57. Treatment with Decadron, especially in view of Plaintiff's favorable response to this drug, was appropriate at that time. According to Dr. Wolff M. Kirsch, Professor of Neurosurgery at the University of Colorado Medical Center in Denver, the renewed administration of Decadron after January 11, 1971 was appropriate in view of the fact that scarring around the optic nerve, resulting in loss of vision, could continue even after the brain swelling has sub-

sided. Decadron acts to prevent such scarring, as well as to inhibit increases in intracranial swelling.

Dr. Ignelzi is an expert in his own right on the subject of corticosteroids. The dosage of Decadron administered to Plaintiff was within normal limits for the treatment of pseudotumor cerebri and its complications. Dr. Kirsch testified that the treatment and care of Plaintiff at the Hospital conformed to the standard of care in the medical community at that time for the treatment of pseudotumor cerebri. *See also* Deposition of Dr. Ryan at 17–18. In effect, Plaintiff's life was saved by the decisive, swift, and exemplary action of Dr. Ignelzi in this case.

The risk of aseptic necrosis was only a remote possibility in comparison to the immediate probability of Plaintiff's permanent loss of vision or even of his life. *Id.* at 24. Aseptic necrosis is a very uncommon complication of steroid therapy. *Id.* at 25. Dr. A. C. True, a physician with Merck & Co., testified that only two cases of aseptic necrosis from the use of Decadron have been reported to Merck, the manufacturer of the drug, since it was marketed. Dr. Ryan noted that it generally requires more than six months of steroid therapy to develop aseptic necrosis. *Id.* at 34–35. He has seen one patient, out of approximately fifteen with pseudotumor cerebri, who has developed aseptic necrosis after two years of steroid treatment (not with Decadron). *Id.* at 27, 33. Plaintiff was given Decadron for only two months. There is no doubt that other treatments, i. e. radical surgical procedures to relieve the intracranial pressures, entailed greater risks to Plaintiff. *Id.* at 12, 21. We conclude that the Decadron therapy given to Plaintiff at the VA Hospital in 1970–1971 conformed to proper standards of medical care in the Denver area at that time.

## IV.

Plaintiff also claims that Dr. Ignelzi was guilty of malpractice in that Plaintiff was not informed that he risked contracting

aseptic necrosis by continued treatment with Decadron. We hold that Dr. Ignelzi need not have warned Plaintiff of this specific risk, and that such failure to obtain informed consent was not a proximate cause of Plaintiff's injuries.

Plaintiff was informed that Decadron "was bad for old people, and it would make him sterile." Aseptic necrosis is one of about fifty potential adverse side-effects of Decadron enumerated in PDR. Ex. 10. There is no doubt that by January 11, 1971, when Decadron treatment was resumed, Plaintiff possessed the mental alertness to make an intelligent decision as to whether he would accept Decadron treatment.

■ It has long been recognized, at least in principle, that physicians do not have unlimited rights to manipulate their patients' bodies:

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body; a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.

*Schloendorff v. Soc. of N. Y. Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Judge Cardozo). In Colorado, once a plaintiff demonstrates that he was not informed of the risk, the burden shifts to the defendant to show that the non-disclosure was proper:

> if the plaintiff shows that the physician failed to provide information about the risks involved in the *proposed course of treatment*, and, that therefore, any consent given by the plaintiff was uninformed, the burden is then on the physician to come forward with evidence that the nondisclosure conforms with the community standard of care in similar cases. *See* Colorado Jury Instructions 15:11.

*Short v. Downs*, 36 Colo.App. 109, 537 P.2d 754, 758 (1975).

■ On the issue of informed consent, Plaintiff need not introduce evidence that community medical standards were violated, as long as a failure to inform is established. *Hamilton, supra* at 1104–1105. In the instant case, Defendant has established that Dr. Ignelzi's failure to inform Plaintiff of the risk of aseptic necrosis conformed to community medical standards. On January 11, 1971, the risk of aseptic necrosis from a proposed short-term treatment with Decadron was insignificant, especially in comparison with the significant risk of increased intracranial pressure and blindness. Depos. of Dr. Ryan at 60. We note that Dr. Ryan himself would not have discussed the risk of aseptic necrosis with Plaintiff. *Id.* at 24, 60.

The Colorado rule regarding informed consent is tempered by considerations of practicality:

> The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question if it appears, all circumstances considered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation.

*Mallett v. Pirkey*, 171 Colo. 271, 466 P.2d 466, 473 (1970). *See Short, supra* at 758; *Stauffer v. Karabin*, 30 Colo.App. 357, 492 P.2d 862, 865 (1971). *See also, Canterbury v. Spence*, 150 U.S.App.D.C. 263, 277, 464 F.2d 772, 786 (1972).* Aseptic necrosis is only one of about fifty possible adverse side-effects of Decadron listed in PDR. PDR is prepared from information provided by pharmaceutical companies, and includes all potential risks, no matter how slight. Depos. of Dr. Ryan at 28–29. Most importantly, aseptic necrosis is not a significant risk of Decadron, especially when taken only over a short span of time. To explain all the risks to a patient inherent in a

---

* Cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

particular treatment, as here, would be inexpedient and confusing.

In Colorado, the duty to disclose medical risks depends on whether a defendant can show that the physician's conduct conformed to community medical standards of disclosure. The leading federal case on the subject of informed consent, *Canterbury, supra,* held that the duty to disclose information is not determined by medical custom. Rather, *Canterbury* held that the duty to disclose depends on the patient's right to know and to consent to treatment:

> In our view, the patient's right of self-decision shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination on treatment, the law must itself set the standard for adequate disclosure . . . no less than any other aspect of negligence, the issue on nondisclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs. If, but only if, the fact-finder can say that the physician's communication was unreasonably inadequate is an imposition of liability legally or morally justified.

*Canterbury, supra,* 150 U.S.App.D.C. at 277–278, 464 F.2d at 786–787.

Under both *Canterbury* and the Colorado standard, the patient's right to know and consent depends on an objective determination of what information a prudent person in the patient's position would require in order to make an intelligent decision. Once it is determined that there was a non-disclosure, the defendant must show that the physician's failure to inform was reasonable, i. e. that a reasonable plaintiff would not have objected to such treatment had full disclosure been made. *Canterbury, supra,* 150 U.S.App.D.C. at 288, 464 F.2d at 787; *Hamilton, supra* at 1105.[7]

■ Because of the insignificant risk of aseptic necrosis in this case, we hold that Dr. Ignelzi's failure to inform Plaintiff of that risk was reasonable. It was also in conformity with community medical standards at that time. Accordingly, the failure to inform Plaintiff in this case was proper under both the *Canterbury* and Colorado standards. We further hold that even if Plaintiff were fully informed of the risk of aseptic necrosis, Plaintiff would not reasonably have rejected Decadron treatment. Although Plaintiff testified, with the benefit of hindsight, that he was not sure whether he would have undergone steroid treatment had he known all the risks involved, such testimony is to be regarded with skepticism. *Canterbury, supra; Hamilton, supra.* When faced with a choice of probable blindness due to scarring, and possible renewal of brain swelling, the remote risk of aseptic necrosis would not have caused a reasonable patient to reject corticosteroid treatment. Nor would the slight risk of aseptic necrosis cause a reasonable patient to opt for much more immediately hazardous radical surgical procedures. We conclude that Defendant is not liable for the reasonable failure to inform Plaintiff in this case.

ORDER

Accordingly, it is hereby ORDERED that the Clerk of the Court enter judgment for Defendant United States of America and against Plaintiff Dennis Niblack, Defendant to recover its costs. This opinion constitutes our findings of fact and conclusions of law.

7. See Note, *Informed Consent in Medical Malpractice,* 55 Cal.L.Rev. 1396, 1404, 1407 (1967).